## ADOPTION OF GREGORY.

Middlesex. March 5, 2001. - May 15, 2001.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Americans with Disabilities Act. Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Adoption,* Dispensing with parent's consent, Visitation rights.

This court concluded that, because proceedings to terminate parental rights under G. L. c. 210, § 3, do not qualify as "services, programs, or activities" under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 (2000), the ADA may not be raised as a defense in such proceedings [119-122], and that, prior to the G. L. c. 210, § 3, proceedings in this case, the Department of Social Services had reasonably accommodated the parents' special needs as required by the ADA, as well as the Commonwealth's antidiscrimination laws and its Constitution [122-125].

In a proceeding under G. L. c. 210, § 3, to dispense with parental consent to the adoption of a minor child, the judge's findings of parental unfitness were supported by clear and convincing evidence, and none of the judge's findings was clearly erroneous. [125-129]

On appeal from a judgment pursuant to G. L. c. 210, § 3, dispensing with parental consent to the adoption of a minor child, this court declined to remand the case for proceedings to reconsider the judge's refusal to order posttermination and postadoption visits, where the judge had properly addressed the issues when she allowed the petition of the Department of Social Services. [129]

PETITION filed in the juvenile session of the Woburn Division of the District Court Department on March 11, 1997.

The case was heard by *Margaret S. Fearey,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Christopher E. Lee* for Department of Social Services.

*Harriet Schechter* for the child.

The following submitted briefs.

*R. Scott Miller, Jr.,* for the father.

*Susan F. Drogin* for the mother.

*Colby C. Brunt, Frank J. Laski, Miriam H. Ruttenberg &*

*Leigh W. Mello* for the Mental Health Legal Advisors Committee & another, amici curiae.

· IRELAND, J. This case raises the first impression question whether the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 (2000), applies to the termination of parental rights proceedings. The parents appeal from a judgment of the juvenile session of the District Court dispensing with their consent to adoption of their son pursuant to G. L. c. 210, § 3. We transferred the case to this court on our own motion. The father claims that the judge erred in terminating his parental rights because the Department of Social Services (department) failed to accommodate his disabilities in its provision of services. In addition, the parents assert that the judge erred in finding parental unfitness and refusing to order posttermination and postadoption visits. We conclude that, because termination proceedings do not constitute "services" under the ADA, the ADA may not be raised as a defense to these proceedings. We affirm the decree dispensing with the need for parental consent to adoption.

1. *Background.* The child, whom we call Gregory, was born on March 3, 1997. The hospital staff were concerned immediately that his parents could not care for him. The mother had failed consistently to attend prenatal classes during her pregnancy. After Gregory's birth, she exhibited poor impulse control and an inability to focus on her baby. She admitted to the hospital staff that she did not know what to do with Gregory, would not be able to manage at home, had a bad temper and did not want to hurt him. She referred to Gregory as a "brat," and said such things as, "I don't care about the 'f——ing baby,' " and, "If you [Gregory] give me a wakeup call, I'll kill you." Moreover, while in the hospital, she displayed a lack of concern for personal hygiene and an inability to learn basic caretaking skills, such as diapering and burping. The mother's shortcomings were compounded by the father's inability to provide sufficient support and care to Gregory. Additionally, the parents frequently argued in front of Gregory, and the mother spoke in a loud argumentative voice. Such behavior greatly distressed Gregory, who, due to various medical problems discussed below, is unusually disturbed by loud noises. Based on these concerns,

the hospital staff filed a mandated reporter report with the department, pursuant to G. L. c. 119, § 51A, alleging that Gregory was at risk of neglect. On March 11, 1997, pursuant to G. L. c. 119, § 24, the department filed a petition in the District Court, alleging that Gregory was in need of care and protection. The department was granted temporary custody on that date, and has retained custody of Gregory since then. The judge subsequently allowed the department's motion to amend the petition to request that the court dispense with the parents' consent to adoption, pursuant to G. L. c. 210, § 3.

To the extent it informs our assessment of the case, we briefly describe Gregory's medical condition. He suffers from complex medical and developmental problems and consequently requires substantial assistance performing daily activities. He is afflicted with global developmental delays and possible mild cerebral palsy. He requires assistance to sit, has tactile hypersensitivity, lacks speech and language development, and exhibits limited spontaneous interaction. He also suffers from cognitive delays, has a short attention span, and engages in a rocking behavior and head shaking when he is not occupied. Due to his difficulty ingesting solid foods, his foster parents must prepare him for meals by massaging his gums, mouth and lips. Gregory's morning routine usually requires up to one and one-half hours of concentrated work on the part of his foster parents. He also needs them to perform thirty minutes of physical therapy on him three times a day. Gregory will continue to require this therapy, as well as other medical intervention, to address his many needs.

Prior to trial, the department, intending to reunify the family, provided the parents with services designed to improve their parenting skills. As detailed below, the parents did not utilize the services provided by the department to learn to care properly for Gregory. Therefore, after a ten-day trial, the judge entered her findings of fact and conclusions of law, finding the parents currently unfit to care for Gregory; finding him in need of care and protection; committing him to the custody of the department; and dispensing with the need for the parents' consent to adoption.

2. *Americans with Disabilities Act.* The father contends that

the judge erred in terminating his parental rights, under G. L. c. 210, § 3, because the department failed reasonably to accommodate his cognitive disorder and attention deficit hyperactivity disorder (ADHD) by providing services designed for these disabilities, in violation of Title II of the ADA, 42 U.S.C. § 12132, and art. 114 of the Amendments to the Massachusetts Constitution.[1] As discussed below, we conclude that: (1) proceedings to terminate parental rights under G. L. c. 210, § 3, do not qualify as "services, programs, or activities" under the ADA, and thus, the ADA may not be raised as a defense to such proceedings; and (2) the ADA, as well as Massachusetts antidiscrimination laws, regulations, and its Constitution require the Department to render services that accommodate the parents' special needs prior to G. L. c. 210, § 3, proceedings, which it did in this case.

Congress enacted the ADA "to assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for people with disabilities. 42 U.S.C. § 12101 (a)(8) (2000). The relevant portion of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA requires that the public entity make "reasonable modifications" to allow the person with a disability to receive the services or to participate in the public entity's programs. 28 C.F.R. § 35.130(b)(7) (2001).

Given the novelty of this issue in Massachusetts, we look to other States for guidance. Several courts have recently determined that termination proceedings are not "services, programs or activities" under the ADA, and thus concluded that the ADA may not be raised as a defense to the termination of parental rights. See *In re Antony B.*, 54 Conn. App. 463 (1999); *State ex rel. B.K.F.*, 704 So. 2d 314 (La. Ct. App. 1997); *In re*

---

[1]Although the mother attempts to adopt this argument in her supplemental brief, she did not raise the issue below, and thus, it is waived. See *Adoption of Mary*, 414 Mass. 705, 712 (1993); *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 697 (1984) ("As a general practice we do not consider issues . . . raised for the first time in this court").

*Terry*, 240 Mich. App. 14 (2000); *In re B.S.*, 166 Vt. 345, 350-355 (1997). See also *Stone* v. *Daviess County Div. of Children & Family Servs.*, 656 N.E.2d 824 (Ind. Ct. App. 1995); *In re Torrance P.*, 187 Wis. 2d 10, 15-16 (Ct. App. 1994). Although at least one court has held that the ADA may constitute an affirmative defense to a termination proceeding, that court ruled that the defense had been waived by the failure to plead it. See *In re C.M.*, 996 S.W.2d 269 (Tex. Ct. App. 1999). Other courts have avoided reaching the question by finding on the facts presented that the State agency, through the provision of services designed to meet the parent's special needs, had met any obligations that might be imposed by the ADA. See, e.g., *In re C.M.*, 526 N.W.2d 562 (Iowa Ct. App. 1994); *In re Angel B.*, 659 A.2d 277 (Me. 1995); *In re Welfare of A.J.R.*, 78 Wash. App. 222 (1995).

We conclude that proceedings to terminate parental rights do not constitute "services, programs, or activities" for the purposes of 42 U.S.C. § 12132, and therefore, the ADA is not a defense to such proceedings. In our view, the parents' rights are secondary to the child's best interests and thus, the proper focus of termination proceedings is the welfare of the child. G. L. c. 210, § 3. *People ex rel. T.B.*, 12 P.3d 1221, 1223 (Colo. Ct. App. 2000). See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 118-119 (1984). Despite the parents' special needs or limited capabilities, "the child is entitled to at least a minimum level of parental care." *People ex rel. T.B.*, *supra* at 1224. See *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262 (1996) ("the central judgment" concerns whether parent "has the capacity to act as a fit parent"). Although the department is a public entity and therefore subject to the ADA, see 42 U.S.C. § 12131 (2000), "nothing in the ADA suggests that a violation of the statute would interfere with the right of the state to terminate parental rights. To allow the provisions of the ADA to constitute a defense to termination proceedings would improperly elevate the rights of the parent above those of the child." *People ex rel. T.B.*, *supra.* See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 268-269 (1978) (under G. L. c. 210, § 3, judge's task is to determine [1]

whether parents can assume parental responsibility for child; and [2] whether dispensing with parental consent to adoption serves best interests of child). Accordingly, we hold that a parent may not raise violations of the ADA as a defense to a termination of parental rights proceeding.

At the same time, the ADA, as well as Massachusetts anti-discrimination laws, regulations, and our Constitution all require the department to accommodate the parents' special needs in its provision of services *prior* to a G. L. c. 210, § 3, termination proceeding. See 42 U.S.C. § 12131; 110 Code Mass. Regs. §§ 6.01 (1), 6.02 (1998); G. L. c. 210, § 3 (*c*) (v) (requires court to consider whether parents "were offered or received services intended to correct the circumstances and refused or were unable to utilize such services on a regular and consistent basis"); 110 Code Mass. Regs. § 1.08 (1998) ("The Department shall make reasonable accommodations to ensure that its services . . . are accessible to all handicapped persons . . . . The Department shall be responsive to issues of handicapping conditions by utilizing social workers who are attuned to the special needs of handicapped persons"); 110 Code Mass. Regs. § 1.09 (1998) ("No applicant for or recipient of Department services shall, on the ground of . . . disability . . . be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination in connection with any service, program, or activity administered or provided by the Department"); art. 114 ("No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the Commonwealth").

In this case, the department reasonably accommodated the father's disabilities. As the judge found, the department provided ample services, specifically tailored to meet the father's special needs and designed to improve his parenting skills. The department initially scheduled visitations between the parents and Gregory twice a week, commencing at the time of his removal from them, in order to provide the father an opportunity to bond with Gregory. Unfortunately, the father did not meet this enhanced visitation schedule. To address this problem, the

department extended the duration of the visits to three hours, but reduced their frequency to a weekly basis.

The department also accommodated the father by retaining a particular social worker because of her experience working with cognitively limited individuals such as the parents. She was originally assigned to investigate the 51A report and submit an investigation report pursuant to G. L. c. 119, § 51B. In normal circumstances, when the 51B assessment period ended, the case would have been transferred to an assessment worker and then to an ongoing social worker. However, as a direct response to the father's special needs, the department changed its usual practice by keeping her on the case. Moreover, in light of the father's cognitive limitations and need for concrete and repetitive parenting instructions, the social worker sought advice from the Boston Children's Services Association in providing parenting instructions to cognitively limited adults. The social worker then referred the parents to the Catholic Charities' parenting program, which specializes in instructing cognitively limited parents. Thus, in addition to the social worker's parenting instructions, the parents also received education designed for their special needs in these one-on-one parenting classes.

"The [father's] failure cannot be laid at the department's door." *Adoption of Paula*, 420 Mass. 716, 730 (1995). He did not make use of these numerous accommodations. Indeed, he was not present for the entire hour of any of the parenting sessions, nor did he attend any parenting classes at Catholic Charities for the entire month of July, 1998. Although he did attend one session on August 31, 1998, the instructor terminated the sessions shortly thereafter due to the parents' lack of interest. Moreover, the social worker was unable to communicate effectively with Catholic Charities because the father refused to sign the releases necessary for her to discuss his progress with the instructor. She continued to provide three hours of weekly visits between the parents and Gregory, and after witnessing the lack of the parents' progress, sent a letter to the instructor outlining these observations, as well as specific areas for the instructor to cover in the one-on-one parenting sessions. She investigated additional services for the parents, particularly those offered by the Department of Mental Health, but the father

did not pursue such services. She also suggested that the parents live in a supervised residential setting with Gregory. The father refused because he did not want to give up his housing or his job. She tried to involve the father in Gregory's medical appointments, with no success. The record clearly shows that the department made substantial efforts to accommodate the father's special needs. That he was unable to develop stronger parenting skills cannot be attributed to the department's alleged failure to provide adequate services.

Finally, we note that a parent must raise a claim of inadequate services in a timely manner so that reasonable accommodations may be made. If a parent believes that the department is not reasonably accommodating a disability, the parent should claim a violation of his rights under either the ADA or other antidiscrimination legislation, either when the parenting plan is adopted, when he receives those services, or shortly thereafter. At that point, the court or the department may address the parent's claim. However, where, as here, a disabled parent fails to make a timely claim that the department is providing inadequate services for his needs, he may not raise noncompliance with the ADA or other antidiscrimination laws for the first time at a termination proceeding.

Here, the father had two possible options to remedy his complaint of inadequate services. He could have pursued his claim that the service plan and other department services failed to address his disabilities through an administrative fair hearing or grievance process. See 110 Code Mass. Regs. §§ 6.07, 10.05, 10.06, 10.37, 10.39 (1998).[2] Alternatively, he could have commenced a separate action for discrimination under the ADA. He did neither.

Furthermore, throughout the entire case, the father was represented by counsel, who could have raised this issue at an earlier point in time. After the investigator's report of the "conditions affecting the child" became available, the parties

---

[2]If the father believed that the department's services were not in conformity with its policies or regulations, he could have requested a fair hearing, 110 Code Mass. Regs. § 10.05 (1998). Alternatively, he could have rejected his service plan and filed a grievance pursuant to 110 Code Mass. Regs. § 10.37 (1998). See also 110 Code Mass. Regs. § 6.07 (1998).

met for a mandatory pretrial conference. G. L. c. 119, § 24. See Juvenile Court Standing Order 1-93(4)(iv) ("Among those issues to be considered at the pre-trial conference are . . . any . . . matter[s] which, in the discretion of the court, may aid in the adjudication and disposition of the case"). Clearly, because the parents' receipt of adequate services relates to the "adjudication and disposition of the case," this conference provided an excellent forum for the father's attorney to raise the matter, which he did not do.

The only indication that the father requested specific services appeared in a letter, dated June 18, 1997, from the father's attorney to the social worker, in which he suggested parenting classes for cognitively limited people at Boston Children's Services.[3] As previously discussed, she took this suggestion and contacted a social worker at Boston Children's Services, who, for various reasons,[4] recommended the parenting classes at Catholic Charities, which the social worker subsequently arranged for the parents to attend. Prior to trial the father never claimed that the classes at Catholic Charities were inadequate. To the contrary, by refusing to sign the release forms, he effectively obviated any discourse with the department about the adequacy of the services for his disabilities.

3. *The judge's findings of fact.* The mother and father also argue that the judge's findings are not supported by the evidence and that there is not clear and convincing evidence of parental unfitness. We disagree.

In determining whether to dispense with parental consent to adoption, a judge must "evaluate whether the [parent is] able to assume the duties and responsibilities required of a parent and whether dispensing with the need for parental consent will be in the best interest of the [child]." *Adoption of Mary,* 414 Mass. 705, 710 (1993). Because the termination of parental rights is

---

[3]The father also claims that he requested accommodations for his disability by attempting "to find living arrangements that combined parenting instructions with living arrangements." However, the parents ultimately decided that they were not interested in such arrangements.

[4]The social worker learned that, unlike the class at Catholic Charities, the parenting class taught at Boston Children's Services consisted of three or four other couples, did not involve Gregory actually being present, ran only for eight to ten sessions, and was therefore not appropriate for the parents' needs.

an "extreme step," *Adoption of Frederick*, 405 Mass. 1, 5 (1989), quoting *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 119 (1984), we require the judge to make specific and detailed findings, demonstrating that close attention has been given the evidence. *Care & Protection of Laura*, 414 Mass. 788, 791 (1993). *Adoption of Frederick*, *supra* at 4-5. Subsidiary findings must be supported by a preponderance of the evidence, *Adoption of Helen*, 429 Mass. 856, 859 (1999), and none of the findings will be disturbed unless they are clearly erroneous. *Adoption of Greta*, 431 Mass. 577, 587 (2000). *Custody of Eleanor*, 414 Mass. 795, 799 (1993). Substantial deference is given to the judge's assessment of the weight of the evidence and the credibility of witnesses. *Adoption of Quentin*, 424 Mass. 882, 886 (1997). Taken together, these findings must prove clearly and convincingly that the parents are currently unfit to further the welfare and best interest of the child. *Adoption of Kimberly*, 414 Mass. 526, 528-529 (1993). See *Adoption of Quentin*, *supra*; *Custody of Two Minors*, 396 Mass. 610, 618-620 (1986). "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." *Adoption of Mary*, *supra* at 711. General Laws c. 210, § 3(*c*), provides thirteen nonexclusive factors for consideration in these cases.

The department met its burden of clearly and convincingly proving parental unfitness. The judge made ninety detailed findings depicting the parents' history of mental illness and substance abuse, their inability to learn necessary parenting skills, their pattern of neglect of Gregory, their late and missed appointments, their violent arguments and disruptive outbursts, and their failure to utilize the services provided by the department.

Specifically, the judge concluded that both the mother and father suffer from "significant and demonstrable cognitive, mental health and substance abuse histories that make it virtually impossible for them to parent [Gregory] adequately given

his significant special needs."[5] Both parents suffer from poor impulse control, and as result, were often agitated in Gregory's presence. The mother sometimes became so upset over minute incidents that she was unable to attend to Gregory's needs. On one occasion, the father, exhibiting an extreme level of frustration and inappropriate behavior, threatened to kill the social worker. Moreover, the parents often engaged in physically violent arguments, prompting the father to admit, "The cat gets scared. Imagine what a child would do." With the exception of the mother's attending Gregory's circumcision shortly after his birth, the parents have failed to attend any of his medical appointments. This failure is particularly noteworthy in light of the parents' need to comprehend Gregory's numerous medical problems and considerable special needs in order to parent him.

Despite the services provided by the department, the parents failed to learn basic caretaking skills, let alone the special care and physical therapy that Gregory requires for his physical and mental condition. During a parenting session, the mother admitted that she felt she could not parent Gregory, and the father conceded that not only would he feel overwhelmed by the amount of required physical therapy, he "couldn't do the house time," because he "would go nuts." The judge also found that both parents were easily distracted during the parenting classes, and neither could sit through an entire three-hour session.

---

[5]The mother claims that the judge erroneously relied on their mental illness, see *Custody of a Minor*, 378 Mass. 712, 722 (1979), and substance abuse, see *Adoption of Katharine*, 42 Mass. App. Ct. 25 (1997), alone in reaching her decision. While the judge considered these factors, she also found that both parents also suffered from "marked cognitive limitations." Furthermore, while the judge acknowledged that "the mere presence of these problems does not imply" parental unfitness, she made concrete findings, "with the appropriate level of specificity," *Custody of a Minor*, *supra*, that the parents could not sufficiently overcome these problems to be able to provide minimally adequate parenting to a child with significant special needs, despite the abundance of services provided by the department. Cf. *Adoption of Katharine*, *supra* at 34 ("we do not think a cocaine habit, without more, translates automatically into legal unfitness to act as a parent"); *Custody of a Minor*, *supra* (judge simply stated that mother suffered from mental disorder as basis for adjudicating her unfit and failed to answer: "From what shortcomings or handicaps [do] the parent[s] suffer that would endanger the well-being of this child if exposed, and has the necessity of permanently removing the child from its parent persuasively been shown?").

None of the judge's findings was clearly erroneous.[6] "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Custody of Eleanor, supra* at 799, quoting *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977). The judge conducted an extensive hearing over ten days, heard the testimony of nine witnesses whose credibility she was in the best position to assess, and reviewed the documentary evidence.[7] Each finding was amply supported in the record.

---

[6]The parents challenge several subsidiary findings as clearly erroneous. In many of these instances, the mother misinterprets what the judge actually found. For example, the mother incorrectly contends that the judge's finding that she "was not able to determine whether [Gregory's] diaper was actually wet and in need of a change," is contradicted by another finding that the mother "independently changed the [c]hild's diaper without assistance" and that "it is not that [m]other, for example, cannot sometimes change the [c]hild's diaper competently and independently." That the mother is capable of changing Gregory's diapers herself does not equate with her knowing when it is necessary to put such skills to use. Similarly, that the mother was present at seventy-five per cent of the parenting classes does not make the finding that she was not "present for the entire hour of the parenting sessions" clearly erroneous.

Moreover, many of the other arguments "amount to no more than dissatisfaction with the judge's weighing of the evidence and [her] credibility determinations." *Adoption of Quentin*, 424 Mass. 882, 886 n.3 (1997). For example, the father claims that the judge was clearly erroneous in her finding that the father's expert witness was not credible. The mother claims that the judge's finding that she does not work was "simply . . . incorrect" because the mother herself testified that she was employed, although there was record evidence presented to the contrary. Because the judge is in the best position to assess witness credibility, we grant her substantial deference, and see no basis for disturbing her view of the evidence. See *id*; *Custody of Eleanor*, 414 Mass. 795, 800 (1993).

In addition, contrary to the father's assertion, the record amply supported the judge's finding that the department reasonably accommodated the parents by rendering services designed to meet the parents' special needs prior to the G. L. c. 210, § 3, proceeding. See *infra*.

Finally, assuming, without deciding, that some of the judge's findings may have been clearly erroneous, "the judge's over-all conclusion of parental unfitness is [nonetheless] fully supported by the record." *Adoption of Helen*, 429 Mass. 856, 860 (1999).

[7]The father's claim that the judge failed to provide an "even-handed assessment" of the facts is without merit.

For these reasons, the judge's findings were not clearly erroneous and her disposition of the case was supported by clear and convincing evidence of parental unfitness.[8]

4. *Postadoption contact.* The parents claim that this case must be remanded to reconsider the judge's refusal to order posttermination and postadoption visits despite their failure to present any argument at trial that such visits would be in the best interest of the child. "Generally, issues not raised by a losing party in the trial court are not addressed on appeal, absent exceptional circumstances." *Adoption of Mary*, 414 Mass. 705, 712 (1993). See also note 5, *supra*. Although the parents did not raise the issue of postadoption visits at trial, the judge nonetheless addressed it in her decision. She approved the termination of visitation between Gregory and his parents, refused to order postadoption visits, and left the question of Gregory's future contact with the biological parents to the discretion of his adoptive parents,[9] noting that at the time, continued contact did not seem to be in his best interest. See *Adoption of Vito*, 431 Mass. 550, 565 (2000) (child's need for future contact with biological parents is "a matter that is properly left to the wise guidance of [the child's] new family"). The judge found that Gregory has no bond with either biological parent, and does not even appear to recognize them as his parents. See *id.* at 563 ("a judicial order for postadoption contact may be warranted where the evidence readily points to significant, existing bonds between the child and a biological parent, such that a court order abruptly disrupting that relationship would run counter to the child's best interests"). "The judge, therefore, did address postadoption visitation when [s]he allowed the petition and no remand on this issue is required." *Adoption of Mary, supra* at 712.

---

[8]Given the dearth of any evidence of the parents' potential future fitness, the father's argument that this case should be remanded with instructions to defer the decision to dispense with consent to adoption until the department reasonably accommodates his special needs is without merit. Contrast *Adoption of Carlos*, 413 Mass. 339, 345-346 (1992) (entry of decree delayed to "afford the mother a further opportunity to consider" other courses of action where judge felt reunification of mother and child attainable "away from the hardened adversarial stance of the parties").

[9]No adoptive family for Gregory has yet been identified.

5. *Conclusion.* The decree of the District Court is affirmed.

*So ordered.*