NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-273

ADOPTION OF ULON.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from the decree of a Juvenile Court judge terminating the father's parental rights as to his son, Ulon. The father, who suffers from unspecified cognitive, developmental, and learning disabilities, claims that the Department of Children and Families (department) failed to provide him with reasonable accommodations in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (ADA), and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. We affirm.

Background. We summarize the trial judge's undisputed findings of fact. The father and Ulon's mother attended the same middle school and then fell out of contact. Sometime in late 2019, the father and mother met again by chance. The mother, who was fighting with her boyfriend at the time,

_____

[1] A pseudonym.

accepted the father's invitation to accompany him to Vermont, where he was headed for work. The mother stayed with the father at a hotel for two weeks. A few months later, the mother informed the father that she was pregnant, but that she believed her boyfriend, with whom she had reconciled, was the father.

Ulon was born in 2020. The mother came to believe that the child was not her boyfriend's when she saw how much the child resembled the father. Shortly after the child's birth, the mother visited the father and left Ulon with him, saying "this baby is yours." The father did not want anything to do with Ulon until he was certain that Ulon was in fact his biological son, so he asked his mother, the paternal grandmother (grandmother), to take care of the baby. The grandmother cared for Ulon for the next few days, clothing, feeding, and cleaning him. When Ulon was one week old, the grandmother and Ulon's mother together took Ulon to the local police department and asked for advice about Ulon's custody. The police referred them to the court, where they were able to craft a document in which the mother agreed to allow the grandmother to take Ulon home.

The maternal grandfather (grandfather) soon intervened. After disputes about Ulon's custody, the grandmother reluctantly agreed to leave the baby with the grandfather and his partner, who was not the maternal grandmother. Ulon has resided with them ever since.

Meanwhile, the department had become involved days after Ulon's birth, when a report was filed pursuant to G. L. c. 119, § 51A, by the office of Ulon's pediatrician. The report alleged that the mother was "exhibiting unusual behaviors." The mother also admitted to breastfeeding Ulon despite being discouraged from doing so because of her "chronic and frequent" use of marijuana. The mother did not attend the follow-up appointment later that day. Instead, the grandmother took Ulon to the appointment and told the pediatrician that the mother did not want Ulon and was threatening to kill him. The department opened an investigation under G. L. c. 119, § 51B.

Another 51A report was filed when Ulon was about two months old, after the mother made threats to remove Ulon from the grandfather's home and harm him. After the 51B investigation, the department took emergency custody of Ulon and filed a care and protection petition. A Juvenile Court judge granted the department continued custody of Ulon shortly thereafter.

When Ulon was about seven months old the department determined that the mother had made insufficient progress toward reunification, and the goal for Ulon was changed to permanency through adoption. A preadoptive license home study was initiated for the grandfather and his partner but was delayed when Ulon's mother sadly was killed in a car accident.

Around the same time that the mother died, the father established paternity; thereafter, the department began working with him to develop a plan for reunification.  The father received a series of action plans with tasks and services to facilitate reunification.  However, the father lacked any motivation to parent Ulon.  He avoided visits by ignoring calls and messages from his social worker, failed to engage in services or to make any improvements in his parenting skills, and prioritized his hobbies, such as fixing cars, over developing a bond with his son.

Early in the case, the grandmother reported to a department social worker that she was the father's "custodian" because he was "mild[ly] retarded."  However, the department did not become aware of any specific diagnosis until April 2021, shortly after the father established paternity, when the department sought and received records regarding the father's Social Security Disability Insurance (SSDI) benefits.  The SSDI records described the father's disability as cognitive delays and deficits.[2]  The department subsequently updated the father's

---

[2] The father was not aware he was receiving SSDI payments and, testifying at trial, disagreed with the diagnosis.  The grandmother testified that the father had been receiving SSDI payments since he was sixteen years old, which she collected on his behalf.  She also testified that the father knew he was receiving SSDI payments, but the judge did not credit this testimony.

4

action plan and included referrals for five different services to accommodate his cognitive disabilities.  The department also offered to assist the father in applying for these services.  He refused all but one of them -- the neuropsychological evaluation discussed below.  The father did not want or believe he needed services, and he did not want the department to "know his business."

Seeking clarification of the father's disability to make additional accommodations, the department in June 2021 sought a court order to compel the father to undergo a neuropsychological evaluation.  The motion was allowed in early July 2021, about five months before the trial began.  The department referred the father to an entity called Family Networks, which contracted with an entity called Children's Charter.  As of the time of trial, the father was still on a waitlist for this evaluation.[3]

In September 2021, the father's counsel independently arranged for the father to participate in a neuropsychological evaluation.  The father appeared for the appointment but left soon after it began because he was sweating and felt "weird."

---

[3] The father's ongoing social worker called Family Networks multiple times inquiring if the father could be referred to a different contractor, but she was informed that Children's Charter was the only service available.  The service was halted during the COVID-19 pandemic, and was just starting to resume services at the time of trial.

He refused to return for his make-up appointment the next day and never completed the evaluation.

In October 2021, the father's counsel wrote a letter to the department's ADA liaison requesting reasonable accommodations for the father. The liaison responded one month later, stating the department's position that the father's action plan already provided him with sufficient accommodations.

Discussion. The father claims that the trial judge's finding of unfitness violated the ADA because it did not take into account the possibility the father could care for the child with the support of the grandmother. He also argues that the decision to terminate his parental rights violated the ADA because the decree entered before the father could complete the neuropsychological evaluation, denying him the opportunity to benefit from accommodations tailored to his specific diagnosis.

1. The ADA. Congress enacted the ADA to "assure equality of opportunity, full participation, independent living, and economic self-sufficiency" for individuals with disabilities. 42 U.S.C. § 12101(a)(8). The relevant portion of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA requires that

6

a public entity make "reasonable modifications" to allow individuals with disabilities to receive the services or to participate in the public entity's programs.  28 C.F.R. § 35.130(b)(7).

However, "proceedings to terminate parental rights under G. L. c. 210, § 3, do not quality as 'services, programs, or activities' under the ADA, and thus, the ADA may not be raised as a defense to such proceedings" (citation omitted).  Adoption of Gregory, 434 Mass. 117, 120 (2001).  The ADA does require that the department provide appropriate services as reasonable accommodations for a parent's disability.  See id.  "What constitutes reasonable efforts . . . must be evaluated in the context of each individual case."  Care & Protection of Walt, 478 Mass. 212, 227 (2017).

2.  Support from the grandmother.  The department had the burden to prove by clear and convincing evidence that the father was unfit.  See Adoption of Gregory, 434 Mass. at 125-126. "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age."  Adoption of Mary, 414 Mass. 705, 711 (1993).

The father contends that because of his disabilities, the judge was required to factor family support into its fitness

7

determination, and that the judge erred by failing to consider the possibility that assistance from the grandmother could compensate for the father's unfitness.  The father's sole support for this claim is an investigation report from U.S. Departments of Justice of Health and Human Services (DOJ/HHS report), included as an addendum to his brief, examining a case in which the department removed a newborn whose mother had a cognitive disability.[4]  The DOJ/HHS report found that the department had overlooked the mother's significant efforts to improve her parenting skills and her ability to care for her child with the support of family members, who were available and eager to help.  Rather, the department insisted that the mother demonstrate she could parent the child on her own, which the report found to violate the ADA's requirement to reasonably modify practices to accommodate disabilities.  In addition, the report faulted the department's "excessive focus" on obtaining a neuropsychological evaluation and an exact diagnosis of the mother's disability, despite the fact that the department already possessed enough information to inform proper accommodations.

---

[4] See Investigation of the Massachusetts Department of Children and Families by the United States Departments of Justice and Health and Human Services Pursuant to the Americans with Disabilities Act and the Rehabilitation Act (DJ No. 204-36-216 and HHS No. 14-182176), dated January 29, 2015.

To the extent we may properly consider the DOJ/HHS report, which was not brought to the attention of the trial judge, it does not assist the father. Here, even without obtaining a specific diagnosis, the department took numerous steps to ensure that the father had access to appropriate services help him learn parenting skills. The father's action plan included referrals to several support services, and the department offered to assist the father in applying for them. Rather than taking advantage of these offers, the father rebuffed them. In addition, at the father's request the ongoing social worker regularly sent him text messages and left voice messages to remind the father of visitation dates and other appointments -- to no avail.

Moreover, the judge did consider the grandmother's assistance. She found that the father's behavior suggested that the grandmother would not be merely assisting the father with caretaking, but rather entirely handling Ulon's caretaking while the father continued his pattern of prioritizing his interests over Ulon's well-being. Unlike the mother in the DOJ/HHS report, the father here has repeatedly demonstrated through words and deeds that he had little interest in parenting his son. The judge's determination that the father was unfit to parent Ulon, with or without the grandmother's assistance, is supported by clear and convincing evidence.

3.  Failure to obtain evaluation.  Despite the fact that the father was on a waitlist to receive a neuropsychological evaluation at the time of trial, we discern no error or abuse of discretion in the judge's decision to terminate the father's parental rights without waiting for the evaluation to be completed.  The department's obligation to work with the father is "contingent upon his own obligation to fulfill various parental responsibilities, including seeking and utilizing appropriate services."  Adoption of Daisy, 77 Mass. App. Ct. 768, 782 (2010), S.C., 460 Mass. 72 (2011).  The record supports the judge's findings that the department repeatedly attempted to enroll the father in services that could have both elucidated and addressed his disabilities, which he refused.  Additionally, the father's counsel arranged for a private neuropsychological evaluation, but the father left shortly after the evaluation began and then refused to complete it.  In her conclusion of law concerning the father's disability and the department's efforts to address it, the judge fully addressed this issue:

> "The Department referred Father for a neuropsychological evaluation and parenting evaluation through Children's Charter.  Due to the pandemic, Father remained on the waitlist of this service, despite the Department's attempt to speed up the process.  At every stage of this care and protection case, Father has denied having a disability or disorder requiring particularized interventions. Nevertheless, the Department acted diligently in reaching out to Father about visits and appointments, asking Father what services he felt would assist him in developing his parenting skills, and communicating with Father in a way

10

that was clear for him to understand. . . . [T]he Department made reasonable efforts to engage Father and provide him with services that would have resulted in a better understanding of Father's limitations or needs. It was Father who failed to utilize such services and made the choice to ignore the Department's requests."

We are not persuaded by the father's circular argument that his refusal to engage in services was a manifestation of his disabilities, which the department should have addressed with other services or accommodations. We also note that the DOJ/HHS report relied on by the father criticized the department for delaying services until it could obtain a precise diagnosis, whereas here the father faults the department for moving forward without a precise diagnosis. While the department must make reasonable efforts to address special needs, "heroic or extraordinary measures, however desirable they may at least abstractly be, are not required." Adoption of Lenore, 55 Mass. App. Ct. 275, 278 (2002). Nor was the judge required to wait indefinitely to give the father additional opportunities to engage in services to address his unfitness as a parent given his well-established pattern of avoiding both services and

11

parenting.  See Adoption of Nancy, 443 Mass. 512, 517 (2005).

Decree affirmed.

By the Court (Blake,
  Massing & Hand, JJ.[5]),

Assistant Clerk

Entered:  January 2, 2024.

---

[5] The panelists are listed in order of seniority.