NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-64

ADOPTION OF RAFFI
(and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Shortly after Raffi and the mother tested positive for cocaine at his birth in March 2019, the Department of Children and Families (department) filed a care and protection petition and was granted temporary custody of Raffi.  The same occurred when Michael and the mother tested positive for cocaine at his birth in August 2020.  The mother later stipulated to her unfitness and the termination of her parental rights and waived her right to appeal.  After a January 2023 trial, a Juvenile Court judge found the father unfit and terminated his parental rights as to both boys, while ordering posttermination and postadoption visitation.  On the father's appeal, we affirm the decrees.

---

[1] Adoption of Michael.  The children's names are pseudonyms.

The judge concluded that the father was unfit based primarily on four factors, no single one of which was dispositive. These were (1) his inability to protect the boys from contact with the mother, who still struggled with drug addiction; (2) his inability or unwillingness to provide them suitable housing; (3) his lack of parenting skills sufficient to meet their basic needs; and (4) his inability to recognize and address the psychological harm they would experience if removed from their placement with the preadoptive parents, where Raffi had lived since September 2021 and which was "the only home [Michael] has ever known."

The judge found that the father, despite some limited signs of improvement over the four-year life of the case, "demonstrated a pattern of passivity that is incongruent with providing for the safety and welfare of children." She also concluded that the father's minimal improvements gave no reason to think he would become fit in the foreseeable future.

On appeal, the father challenges certain of the judge's subsidiary findings and argues that the department failed to prove that he was unfit and would remain so into the indefinite future. It was the department's burden to prove by clear and convincing evidence that the father was currently unfit to parent. See Adoption of Gregory, 434 Mass. 117, 126 (2001).

2

"Subsidiary findings must be proved by a fair preponderance of the evidence." Adoption of Helen, 429 Mass. 856, 859 (1999). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011). Here, we see no need to summarize the evidence supporting the judge's explanation of the basis for termination. We therefore proceed directly to consider the father's arguments on appeal.

1. Substance use. The father appears to challenge the judge's findings and conclusions that he neither understood the need nor had the ability to protect the boys from continuing contact with the mother and her continuing substance use problems. There was ample evidence, however, that this was and continued to be a serious concern. Raffi was conditionally returned to the father's custody for a brief period in April 2019, on the condition among others that the father not allow the mother to have unsupervised contact with Raffi. Less than two weeks later, the father's carelessness led to the mother, while "highly impaired by a substance," being left alone with Raffi and attempting to remove him from a hospital. Raffi was

then returned to the department's custody, where he remained at the time of trial almost four years later.

In the father's trial testimony, he initially could not recall that Raffi tested positive for cocaine at birth. In subsequent testimony he acknowledged knowing of the mother's substance use issues, and he agreed that the hospital incident was "a definite wake up call." Yet he continued an off-and-on relationship with the mother, leading to the birth of Michael. In the father's words, these events "just happened," and the mother's substance use while pregnant with Michael was "out of [the father's] control." The judge found that although the father could not control the mother's addiction, he could have controlled his ongoing relationship with her and the conception of another child.

The father insisted that he understood the dangers of allowing either boy to have unsupervised contact with the mother, and would not allow any contact if she was under the influence. Yet he did not understand whether, if custody were returned to him, he could control the mother's access to the boys, or whether he would be required to coparent with her so she could see them. He had not discussed the issue with his therapist. The department's ongoing social worker testified that the father lacked any strategy for ensuring the boys would

4

not be alone with the mother.  He downplayed the significance of the 2019 hospital incident and merely said he would not do it again.

The department had asked the father in September 2020 to participate in the Allies in Recovery program, to learn how to cope with the mother's substance use problem.  Yet he did not begin participating in it until December 2022, one month before trial.  He previously asserted that he had no need for the program because he had no ongoing relationship with the mother, and that, although he could pay for housing where he could live with the boys, he could not afford the program's $160 cost.  Given the mother's desire for contact, the judge could rightly question the father's commitment to doing what was necessary to learn how to cope with the mother and to protect the boys.

The father challenges as clearly erroneous the judge's finding that "substance abuse would continue to be a threat to the health and safety of the [c]hildren if they were in [the f]ather's care and custody."  The father points out that there was little evidence of his own substance use after 2020.  But he misses the judge's larger concern about his inability to protect the boys from the mother, whose substance use problems continued.

2.  Housing.  From the outset of these cases, one of the
tasks the department placed on the father's action plan was to
secure safe, stable, and appropriate housing for the boys and
himself.  The judge found that the father, despite moving
several times during the cases, had never found "safe stable
housing," i.e., "housing that was his to control and was safe
for the [c]hildren."  On appeal, the father contests the judge's
use of the phrase "stable housing," noting that at the time of
trial he shared an apartment and paid his share of the rent.
But this was not a place where the boys could live; it was a
one-bedroom apartment that he shared with a friend who was not a
potential caretaker for the boys.  This housing may have been
stable, but the father does not address the judge's larger
conclusion that he had "consistently avoided creating a home for
[the boys] to return to."

At trial the father testified that, even before knowing
whether he would regain custody, he was trying to rent his own
apartment where he could live with the boys but had been
unsuccessful.  Yet he was notably vague about those efforts; he
was working with the Wayfinders organization but could not
recall how long he had been on their waiting list or where he
was on the list at the time of trial.  On appeal, the father
shifts gears, arguing that he was financially able to rent his

6

own apartment but had refrained from doing so because there was not yet any reunification plan.  Regardless of which is the more accurate explanation, the father's commitment to finding appropriate housing for himself and the boys could rightly be doubted.

In a similar vein, the father told the ongoing social worker that his plan was to find his own apartment where he could live with the boys and not to move back in with his own mother (paternal grandmother).  Yet at trial he testified that his plan was to move back in with the paternal grandmother.  The department had first inspected her home in April 2022 and found it physically unsuitable, among other reasons because it was "very cluttered."  At trial in January 2023, the adoption social worker testified that the department was still concerned about the "very cluttered" condition of the home, and could not approve the father as well as the two boys moving in with the paternal grandmother.

The judge also had ample basis to doubt whether the father and paternal grandmother had a realistic plan for such a living arrangement.  The father testified that the availability of the paternal grandmother to assist with care was a key part of his plan.  Yet he insisted that he, not the paternal grandmother, would be the primary caretaker.  The paternal grandmother, on

the other hand, testified that it was she who would be "the full-time caretaker." Although the father's work hours significantly overlapped with hers, she offered no reasonable explanation of how she could change or reduce her hours in order to care for the boys while the father worked. The father testified that he would keep them in their existing day care arrangement, yet he did not know how much it cost or how he would pay. The paternal grandmother believed they could attend the day care where she worked, yet she had not inquired whether this was possible, and she did not explain how this would fit with her plan to reduce her hours there. All in all, the judge was entitled to conclude that the father had not adequately planned for a suitable, workable living arrangement for the boys if they were returned to him.

3. <u>Parenting skills</u>. The father argues that the judge's finding of unfitness is unsupportable in light of a department assessment conducted in May 2022 that gave father a "strength" rating in thirteen categories of parenting skills, rated ten categories as "not applicable," and found only a very few areas of "need." The judge was not required to credit this assessment. It was conducted while the father and mother were still seeing the boys only in joint visits, at which the mother did most of the caretaking. Categories such as "provides for

8

child's safety" were listed as "not applicable," inferably because the father's ability in such areas had not been observed at those visits.

The ongoing social worker at the time of trial in January 2023 had not been involved with the May 2022 assessment and did not fully agree with it. She was present at a more recent (September 2022) assessment at which the department identified the father as still deficient in his ability to provide suitable housing; to understand the importance of setting clear, appropriate limits on the mother's contact with the boys; and to understand their needs and set appropriate limits on their behavior. The ongoing social worker testified that, once the father began having his own, separate visits with the boys, although the visits were generally positive, she had needed "to intervene on multiple occasions" when there was "a safety concern" or "one of the children's needs [weren't] being met." She viewed the father as having shown some improvements as a result of parenting classes, but only "inconsistently." In short, the positive ratings in the May 2022 assessment did not preclude the judge from finding the father unfit.

Relatedly, the father appears to argue that because he had participated in various services recommended by the department, there was no basis for the department (and, by extension, the

9

judge) to doubt his understanding of why those services were important and what he needed to learn from them. But the father's own testimony furnished ample basis for the judge to find that he lacked that understanding and had benefited only marginally from the services. The father could say very little about what he learned in his parenting class, or his nurturing fathers class. He testified about his therapy only as an afterthought, describing it as "one of the paperwork that I had to do." He did not know he had a diagnosis, or what it was, although the therapist had told the department he had been diagnosed with cannabis dependency in remission, alcohol dependency in remission, and depressed mood.

4. Bond with foster parents. The father faults the judge for relying on G. L. c. 210, § 3 (c) (vii) (factor vii), as one ground for finding him unfit. Under factor vii, in determining fitness, a judge may consider whether:

> "[B]ecause of the lengthy absence of the parent or the parent's inability to meet the needs of the child, the child has formed a strong, positive bond with his substitute caretaker, the bond has existed for a substantial portion of the child's life, the forced removal of the child from the caretaker would likely cause serious psychological harm to the child and the parent lacks the capacity to meet the special needs of the child upon removal."

Id. Here, the judge found that the boys had developed a "significant and healthy bond with their foster parents who are

10

committed to adopting them" and who they had grown to expect would meet their needs.  The judge further found that the boys, if returned to the father, would experience trauma because of their needs no longer being met and because of their removal from what they considered their home.  The judge found that the father was "not at all prepared for the special needs [of the children] he would then be responsible for."

The father first argues that the boys had no "special needs," in the sense of identified developmental problems, and so the judge's findings were clearly erroneous.  But the phrase "special needs," as it appears in factor vii, refers not to preexisting developmental challenges but instead to "the special emotional need [the child] would have in consequence" of a psychologically traumatic severance of bonds with a preadoptive or other foster parent.  Adoption of Katharine, 42 Mass. App. Ct. 25, 35 (1997).  The judge properly focused on this factor.

The father next asserts that there was insufficient evidence of the boys' bond with the preadoptive parents.  He points out that there was no expert testimony regarding such a bond, and no testimony about it from the preadoptive parents. Yet he cites no decision requiring either type of testimony before a judge may rely on factor vii.  The ongoing social worker testified that the boys had "been in care for a long

11

time, two or three years," and she repeatedly characterized them as "very bonded" to the preadoptive parents, calling them "Mom" and, she believed, "Papi." Raffi sat with the father during visits "but, going in and out, opted to hold onto his foster mother's hand."

There was also evidence that the father did not understand the importance of the boys' relationship with the preadoptive parents. The ongoing social worker testified that, one week before trial, she discussed with the father the boys' bond with the preadoptive parents and whether he would be willing to allow some relationship with them to continue if the boys were returned to his custody. The father replied, "I don't care about that, I really don't," and was adamant that there would be no such contact.

One week later, at trial, the father testified that he had considered the matter further and would be willing to allow contact. Even then, however, his testimony focused on allowing such contact if the preadoptive parents wanted to see the boys, and only secondarily on whether the boys might want or need to see the preadoptive parents. The father told the judge he thought the boys would not "need anything special" as a result of being removed from the people who had cared for them for years and who they called "Mom and Dad." In light of the

12

father's sudden shift of position before trial, and his view that continued contact was of more importance to the preadoptive parents than to the boys, the judge could rightly doubt that the father was prepared to deal with the trauma the boys would feel were their bond with the preadoptive parents severed.

In sum, we see no reason to disturb the judge's determination that the father was and would remain unfit and that the boys' best interests would be served by terminating his parental rights and approving the department's plan for adoption by the preadoptive parents.

<u>Decrees affirmed</u>.

By the Court (Sacks,
  Englander & Grant, JJ.[2]),

Clerk

Entered:  October 23, 2024.

---

[2] The panelists are listed in order of seniority.