NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1416

ADOPTION OF HAZIM (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

This appeal relates to the welfare of two children we refer to as Hazim and Hannah.  On June 25, 2024, a judge of the Juvenile Court found the father unfit to assume parental responsibility and terminated his parental rights.  The father appeals,[2] arguing that (1) the evidence does not support the judge's conclusions that the father was unfit to assume parental responsibility and that his unfitness was likely to continue indefinitely to a near certitude, (2) the judge improperly introduced hearsay statements at trial and improperly relied on those statements in his findings, and (3) the Department of Children and Families (department) failed to provide reasonable

---

[1] Adoption of Hannah.  The children's names are pseudonyms.

[2] The mother also submitted a notice of appeal, but she did not submit a brief and is not a party to this appeal.

efforts to support the father's reunification with the children after the children were placed in third party custody with the eventual adoptive parents.  We affirm.

Procedural history.  The department filed the underlying care and protection petition in February 2022 and the children were placed in the department's temporary custody.  In November 2022, the children were reunified with the parents.  In January 2023, the court granted the parents conditional custody.  The children were removed from the parents' custody on August 11, 2023, following the parents' violation of the terms of their conditional custody agreement.[3]  The conditional custody agreement had required the father to supervise the mother's contact with the children and required both parents to remain free of substances.  After the father allowed the mother to accompany the children to daycare unattended in a rideshare car and the mother presented as under the influence of substances upon arrival at the daycare, the department required the parents to submit toxicology screens.  Both parents failed to complete the screens, and the department removed the children from the

---

[3] This is Hazim's third removal and Hannah's second removal from the parents' custody.

parents' care.  On September 6, 2023, the parents consented to third-party custody with the foster family.[4]

The trial on the parents' fitness and custodial rights spanned seven nonconsecutive days from April 17, 2024, to May 21, 2024.[5]  On the first day of trial, an anonymous caller reported to the court that the father had made statements that he was concerned about doing harm to himself or others depending on the outcome of trial.  As a result, the court ordered that the court clinician conduct a mental health evaluation of the father.  The father failed to appear at trial on April 18, 2024, due to his concerns that he could not assure the safety of himself, the children, and others.[6]

At the conclusion of the trial, the judge determined that the father was unfit to assume parental responsibility and that his unfitness was likely to continue into the indefinite future to a near certitude, and that the best interests of the children

---

[4] The same foster family previously had custody of the children from April 2022 to November 2022.  The foster family had remained active participants in the children's lives following the children's return to the parents' custody in November 2022.

[5] The mother appeared for the first day of trial, and thereafter did not attend any court hearings or meetings.

[6] The father initially reported through counsel that he was sick with COVID and at the hospital but later admitted that was untrue and that he had not appeared out of concern for his mental health and his potential behavior in the event of an unfavorable result at trial.

would be served by terminating his parental rights to the children.

Discussion. 1. The father's fitness. "In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion." Id.

"The concepts of parental fitness and a child's best interests are not separate and distinct but, instead, are cognate and connected steps that reflect different degrees of emphasis on the same factors" (quotations and citation omitted). Adoption of Flavia, 104 Mass. App. Ct. 40, 45 (2024). "Because termination of a parent's rights is an extreme step, a judge must decide both whether the parent is currently unfit and whether, on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary" (quotations and citations omitted). Adoption of Ilona, 459 Mass. at 59. However, a conclusion that

4

unfitness is only temporary "must rest on credible evidence supporting a reasonable likelihood that the parent will become fit, not on a 'faint hope'" (citation omitted).  Id.

The father argues that the evidence was insufficient to find that he was unfit to parent the children and that terminating his parental rights was in the children's best interests.  In challenging the sufficiency of the evidence supporting the judge's determinations, the father also contends (1) that there was no nexus between his substance use disorder and his fitness as a parent, and (2) that the judge could not consider his mental health when he was in fact capable of providing minimally acceptable care.  We disagree.  The judge neither erred in considering these factors nor did he abuse his discretion in ultimately concluding that the father was unfit and that the children's best interests were served by terminating the father's parental rights.

The judge's findings show a significant nexus between the father's substance use disorder[7] and his unfitness.  See Adoption of Katharine, 42 Mass. App. Ct. 25, 34 (1997) (requiring nexus between parent's substance use disorder and neglect or abuse before parent's substance use disorder can support a finding of unfitness).  Multiple reports spanning several years regarding

---

[7] The father has been using cocaine since he was thirteen years old, with periods of intermittent sobriety.

5

the parents conduct stemmed from the father or both parents relapsing on substances, including the December 2021 domestic violence incident when the father relapsed, his failure to take the children to daycare in February 2022 following a relapse, and the most recent removal of the children on August 11, 2023, when both parents failed to submit toxicology screens. Additionally, the father's substance abuse has caused him to be absent and unable to care for the children, either because he was incapacitated, committed to a treatment facility, incarcerated, or willfully left the children in the mother's care while the father used substances outside of the home. The father argues that "the overwhelming majority of concerns" regard the mother's drug usage. The contention is unavailing. Aside from the ways we have just outlined that the father's substance use disorder directly bears on his fitness as a parent, the father has acknowledged that he has enabled mother's substance use by purchasing drugs for her use. Additionally, after the father had kicked the mother out of the family home following her March 2023 relapse, he then, in April 2023, asked for the mother to return to the family home because he was unable to independently manage the children's care.

Further, after the children were removed in August 2023, the father presented as impaired during parent-child visits, has been unwilling to verify his sobriety, and was not consistently

6

engaged in services designed to address his substance abuse disorder, making it foreseeable that the father's substance abuse would continue to affect his parenting if he were to regain custody of the children. See Adoption of Luc, 484 Mass. 139, 147 (2020) ("the parent's willingness to engage in treatment is an important consideration in an unfitness determination where the substance dependence inhibits the parent's ability to provide minimally acceptable care of the child"); Adoption of Katharine, 42 Mass. App. Ct. at 32-33 ("[Judges] may consider past conduct to predict future ability and performance").

The judge also did not err in considering the father's mental health challenges. See Adoption of Luc, 484 Mass. at 146 ("Mental disorder is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs"). Although most of the judge's findings regarding the father's mental health related to the father's conduct surrounding the trial, it is clear that the father's mental health had impacted his parenting long before the trial began. For example, the father acknowledged that a relapse occurring in December 2021 stemmed from his unaddressed childhood trauma.[8] During this relapse, the

_____

[8] The father was sexually abused as a child while he himself was in the department's custody.

father and the mother physically fought, and the next day the mother presented with visible facial injuries including a black eye with a gash, either resulting from the father closing a car door on her or, according to the mother, the father punching her in the face.

Additionally, prior to trial, the department recommended ceasing visitation between the parents and the children out of concern for the parents' mental health. The father acknowledged that he had expressed that he might harm himself or others depending on the outcome of the trial, and the father missed the second day of trial because he was concerned that he could not control himself, thus putting the safety of himself, the children or others in jeopardy if he did not prevail at trial.[9] Notably, in response to a line of questioning regarding the father's mental health, the father admitted that given the state of his mental health he would not presently be able to care for the children if in fact he was awarded custody.

Finally, given the department's long history with Hazim and Hannah, the father's failure to adequately address his substance

---

[9] Indeed, the court clinician's testimony suggests that the father might have harmed the children, or at least recognized that any harm he might have done would have negatively impacted the children: "[The father] spoke for some time about the consequences of any sort of negative behavioral reactions in terms of himself, in terms of safety in others, in terms of his children, and the effect that that would have on his children . . . ."

use disorder, mental health, history of domestic violence in his relationship with the mother, and the father's inability to work with the department forthrightly and productively, it was reasonable for the judge to conclude that the father's unfitness was not temporary and likely to continue into the foreseeable future.  See Adoption of Ilona, 459 Mass. at 59 ("judge's conclusion that a parent's unfitness is temporary must rest on credible evidence supporting a reasonable likelihood that the parent will become fit, not on a 'faint hope'").  While the trial judge acknowledged the bond between the father and his children, in light of the father's inability to provide consistent care for the children, it was not error to conclude that termination of the father's rights and adoption by the foster family was in the children's best interests.  See Adoption of Thea, 78 Mass. App. Ct. 818, 824 (2011) ("The Supreme Judicial Court has emphasized the importance of achieving stability and permanency in children's lives and in decrees dispensing with parental rights").

2.  The out-of-court statements.  On the first day of trial, an anonymous person called the court and informed a clerk that the father had threatened to harm himself or others.  At trial, after the father acknowledged that he had told someone of his concern that he might harm people depending on the outcome of the trial, the father's attorney asked the father whether he

9

had "ever acted out on those feelings that [he] had."  The judge then sua sponte objected to the question as irrelevant because the father's statements depended on the outcome of the trial, which had not yet concluded.  The father takes issue with the fact that the judge relied on the caller's out-of-court statements to sustain the sua sponte objection to his attorney's question and contends that the judge's findings improperly relied on the caller's out-of-court statements.

"The court must decide any preliminary question about whether . . . evidence is admissible.  In so deciding, the court is not bound by the law of evidence, except that on privilege." Mass. G. Evid. 104(a) (2025).  The judge did not abuse his discretion in admitting facts about the nature of the father's threats to determine whether testimony on those threats would be relevant.

While the judge's findings indirectly refer to the caller's out-of-court statements, the judge does not rely on the statements themselves in his findings of fact.  Rather, the judge relied on the father's in-court statements acknowledging that the caller's report was correct, and those in-court statements were properly admitted.  See Mass. G. Evid. 601(a) (2025) ("Every person is competent to be a witness unless a statute or the Massachusetts common law of evidence provides otherwise"); G. L. c. 233, § 20 ("Any person of sufficient

10

understanding, although a party, may testify in any proceeding, civil or criminal, in court or before a person who has authority to receive evidence . . . ").

3. The department's reasonable efforts. The father argues that the department failed to make reasonable efforts by failing to investigate placing the children with relatives and by discontinuing the father's visits with the children during the trial. Where a court of competent jurisdiction has "granted custody or transferred responsibility for a child to the department or its agent, the court shall determine . . . whether the department or its agent has made reasonable efforts to make it possible for the child to return safely to his parent or guardian." G. L. c. 119, § 29C. However, "a parent must raise a claim of inadequate services in a timely manner so that reasonable accommodations may be made." Adoption of Gregory, 434 Mass. 117, 124 (2001).

The father contends that the department failed to make reasonable efforts in identifying familial placements for the children for the first time at trial. Accordingly, the issue is waived and need not be addressed here. See Id. (parent may not claim inadequate services for the first time at termination proceeding).

Additionally, while the foster family terminated visits between the parents and children during the trial, as was their

11

right, they did so at the department's request due to concerns for the parents' mental health.  See G. L. c. 119, § 21 ("custody" includes the power to "control visits to a child").

Decrees affirmed.

By the Court (Blake, C.J.,
Desmond & Singh, JJ.[10]),

Clerk

Entered:  January 12, 2026.

---

[10] The panelists are listed in order of seniority.

12