IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 2, 2024

**IN RE KAMDYN H., ET AL.**

**Appeal from the Juvenile Court for Sullivan County**
**No. J39995          Mark H. Toohey, Judge**
_____

**No. E2023-00497-COA-R3-PT**
_____

This is an appeal of a termination of a mother's parental rights. The Juvenile Court for Sullivan County ("the Juvenile Court") terminated the parental rights of Tara C. ("Mother") to two of her children, Kamdyn H. and Bentyn H. upon finding that the Tennessee Department of Children's Services ("DCS") proved by clear and convincing evidence that Mother was mentally incompetent and that it was in the best interest of Kamdyn and Bentyn for Mother's parental rights to be terminated. Mother has appealed. Upon our review, we affirm the Juvenile Court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Alice Alexander, Kingsport, Tennessee, for the appellant, Tara C.

Jonathan Skrmetti, Attorney General and Reporter, and Amber L. Barker, Senior Assistant Attorney General for the appellee, Tennessee Department of Children's Services.

**OPINION**

**Background**

This appeal is the most recent stage of a nearly fourteen-year long case involving DCS and Mother, who has suffered from severe mental illnesses for many years. During the pendency of this case, Mother and Ronald H. ("Father") had four children together:

Ethyn H., Kamdyn H., Bentyn H., and Makinlyn C.[1]  Although DCS was involved with all four children to varying degrees throughout the case, its ultimate petition to terminate Mother's parental rights related only to Kamdyn and Bentyn ("the Children").  Maternal grandmother, Whitney M. ("Grandmother"), has custody of Makinlyn, and Makinlyn was never a subject of DCS's termination petition or its subsequent amendments.  Ethyn, the eldest child, was placed under the guardianship of relatives, and DCS accordingly removed Ethyn from its ultimate termination petition.  Our focus is limited to the Children.

DCS first became aware of problems in the family's home in 2010 after it received a referral alleging that Father had assaulted Mother while she was pregnant with Bentyn. Father's domestic violence was a central concern for DCS, but Mother's substance abuse and mental condition eventually became the main issue.  In December 2010, DCS filed a petition, seeking an order enjoining Father from having any unsupervised contact with Ethyn and Kamdyn.  When this case first began, Bentyn and Makinlyn had not yet been born.

DCS also requested the Juvenile Court to order Mother to undergo a mental health evaluation, receive domestic violence counseling, and seek an order of protection from Father.  The Juvenile Court accordingly entered an *ex parte* restraining order, prohibiting Mother from allowing Father to have unsupervised contact with Ethyn and Kamdyn.  In another order, the Juvenile Court found that there was probable cause that Ethyn and Kamdyn were dependent and neglected.

A few months later, in February 2011, DCS filed a petition for temporary legal custody of Ethyn and Kamdyn, alleging that Mother and Father had continued their relationship and that Father had assaulted Mother again two weeks earlier.  The Juvenile Court entered a "No Contact Order" between Father and Mother.  In July 2011, DCS filed another petition with respect to Bentyn, who had recently been born.  DCS alleged that Mother had taken Bentyn to Father's home where Father and his brother engaged in a physical altercation.  Around this time, Grandmother filed her own petition for temporary custody alleging that Mother had been using illegal drugs and violating the no-contact order by seeing Father.

In August 2011, the Juvenile Court entered an order, providing that Mother, Ethyn, Kamdyn, and Bentyn were to reside with Mother's grandmother ("Great-Grandmother") and that Grandmother would be allowed two consecutive weeks of visitation.  The Juvenile Court ordered all contact between Mother and the three boys to be supervised by Great-Grandmother or Grandmother.  Soon after, the Juvenile Court changed the arrangement again, this time granting Grandmother physical custody and guardianship of Ethyn and

---

[1] Father passed away in 2018, prior to the conclusion of the termination trial, and is not a party to this appeal.

Kamdyn at her residence in Virginia and granting Scott C. ("Grandfather") and his wife physical custody and guardianship of Bentyn. Mother retained legal custody.

In March 2012, DCS filed an amended petition for temporary legal custody, alleging that Grandmother was no longer able to provide for Ethyn and Kamdyn and that Grandfather was no longer able to provide for Bentyn. DCS requested the Juvenile Court award temporary legal custody of the three children to Brian and April E., their first foster parents. In addition, DCS alleged Mother had continued to violate the no-contact order by having contact with Father and allowing the three boys to have contact with Father. DCS further alleged Mother had tested positive for cocaine, opiates, and benzoylecgonine, that she had been admitted to the Bristol Regional Medical Center Emergency Room as a result of using bath salts, that she had been diagnosed with bipolar disorder, and that she had been uncooperative.

By June 2012, DCS filed another amended petition for temporary legal custody of the three children, this time notifying the Juvenile Court that Brian and April E. were no longer able to provide care for the three children non-custodially. The Juvenile Court entered a protective custody order moving the three children back to DCS custody. Testimony at trial established that Ethyn, Kamdyn, and Bentyn began residing with their second foster parents, Mark and Vicky H. ("Foster Parents") in January 2013. Ethyn left the foster home in 2018, but the Children remained with Foster Parents throughout the pendency of the case. In October 2012, the Juvenile Court adjudicated the Children dependent and neglected.

In January 2013, DCS sought suspension of Mother's weekend visitation with the Children alleging that Mother had tested positive for suboxone, opiates, oxycodone, and methamphetamines at various points since November 2012, and that Mother had abused a prescription for oxycodone. DCS also alleged Mother was not cooperating with Comprehensive Community Services, an inpatient and outpatient program. The Juvenile Court accordingly suspended Mother's weekend visitation and restricted her to supervised visitation.

In January 2014, the Juvenile Court entered an order stating that Mother had not visited the Children since September 2013, had been discharged from three rehabilitation facilities for noncompliance, and had continued to use illegal drugs. The Juvenile Court accordingly suspended Mother's visits with the Children.

DCS filed its first petition to terminate both parents' rights to the Children on January 24, 2014. DCS alleged the following grounds for termination of Mother's parental rights: (1) abandonment by failure to support, (2) substantial noncompliance with the permanency plans, and (3) persistence of conditions. After the first petition was filed, DCS alleged in later filings that Mother had continued to use illegal drugs and had done so while nursing her newborn daughter, Makinlyn. In January 2015, the Juvenile Court adjudicated

Makinlyn dependent and neglected and awarded temporary custody of Makinlyn to Grandmother.

The Juvenile Court provided that Mother would be allowed supervised visitation with all four children at Grandmother's home. In February 2016, the Juvenile Court again suspended Mother's visitation until she could demonstrate evidence of "stable mental health." At this point in the case, Mother had been in multiple inpatient and outpatient programs for substance abuse and mental health treatment and hospitalized due to mental health issues.

Mother filed a motion to reinstate her supervised visitation, stating that she had undergone extensive and intensive treatment and therapy at Woodridge Hospital and was discharged in August 2016. The Juvenile Court entered an order reflecting that the parties agreed that Mother's supervised visitation would be reinstated starting November 1, 2016. However, Elizabeth Kemp, a DCS caseworker assigned to the family's case at the time, testified that Mother's last supervised visit with the Children was in November 2016 because of Mother's continued hospitalizations due to her mental condition. In December 2016, Mother was again admitted to Woodridge Hospital for psychiatric care.

Trial on the initial termination petition began on November 16, 2015. The Juvenile Court heard testimony from Margaret Finely, a therapist with Frontier Health, and Mother. For reasons not entirely clear, two days of testimony were heard in November 2015, but the rest of the testimony was not presented to the Juvenile Court until May and July of 2022. DCS claims in its appellate brief that the nearly seven-year long gap between trial dates was the result of "numerous attorneys being involved throughout the case, the COVID-19 pandemic, and various time-consuming pleadings that were filed by an attorney who no longer is involved in the case." This Court has gleaned from its review of the record that the delay may also have been due in part to DCS losing contact with Mother for several years, as well as the complexity of Mother's mental health status and her various hospitalizations and inpatient stays in mental health facilities. Mother's mental health further deteriorated shortly after the trial dates in late 2015.

DCS filed a motion to amend the termination petition in April 2016, seeking to add the ground of mental incompetence pursuant to Tenn. Code Ann. § 36-1-113(g)(8) with respect to Mother. The Juvenile Court granted DCS's motion, and the matter was continued due to Mother's inpatient stay in a mental health facility. On April 24, 2017, DCS filed its amended petition adding the ground of mental incompetence with respect to Mother and detailing Mother's long history of mental health hospitalizations.

Prior to the filing of the amended petition, Grandmother was awarded a conservatorship over Mother in an order entered by the Chancery Court for Sullivan County ("the Chancery Court") in May 2016. The Chancery Court found that Mother was "a person who by reason of mental and physical infirmity is unable to manage her own

- 4 -

affairs. Due to these medical and mental limitations, she is unable to manage her own property or otherwise make decisions in her own best interest and needs a Conservator to manage her affairs." This conservatorship later was dismissed.

In September 2019, a circuit court in Virginia ("the Virginia Court") appointed Mother's sister ("Aunt") and Grandmother as joint guardians of Mother. The Virginia Court adjudicated Mother to be an incapacitated person, making the following findings:

> Physicians at NOVANT/Prince William Medical Center have diagnosed the Respondent with persistent delusional disorder, schizophrenia, and seizure disorder. Respondent was evaluated by Kossi P. Eklou, NP and Imran Akram, MD who each have the opinion that the Respondent is unable to make medical decisions, and that improvement would not be expected. The probable duration of her disability is permanent in nature.

> Pursuant to the findings and conclusions of the guardian *ad litem*, the Respondent is capable of making decisions regarding her personal care and financial affairs; however, during some periods her schizophrenia manifests itself as elaborate conspiracies and an alternate reality about her life which affects her ability to make sound decisions and keep herself from harm. Respondent is then in need of a Guardian.

(Paragraph numbering omitted.) The Virginia Court granted Aunt and Grandmother decision-making authority in regards to Mother's health care, specifically authority to consent to medications and treatments on her behalf.

In July 2021, DCS filed a motion to supplement its termination petition. DCS noted that over four years had passed since it last amended its petition; that new laws had been passed regarding termination of parental rights, including a revision of the best interest factors; that Father had passed away and was no longer a party to the action; and that Ethyn was no longer in DCS custody and no longer subject to the action.

On October 12, 2021, DCS filed its final amended termination petition, removing Ethyn and Father from the action. The final amended petition related only to the Children. DCS added the additional termination ground of failure to manifest an ability and willingness to assume custody of or financial responsibility for the Children, and alleged the best interest factors as amended by the Legislature in 2021.

Trial was held on May 12-13 and July 14 of 2022. The evidence at trial established that Mother had extensive experience in mental health facilities over the past decade and that her symptoms only began to stabilize once Grandmother and Aunt were appointed her guardians. The evidence also included the Social Security Administration's decision that Mother had been disabled since May 31, 2013 based upon her mental condition. The Social

Security Administration's decision outlined Mother's long history of mental illnesses, hallucinations, psychosis, hospitalizations, and mental health treatment. On March 15, 2023, the Juvenile Court entered judgment terminating Mother's parental rights to the Children upon finding that DCS had proven the ground of mental incompetence by clear and convincing evidence and that termination of Mother's parental rights was in the Children's best interest. The Juvenile Court found that DCS had failed to carry its burden of proof for the other alleged grounds. The Juvenile Court made the following findings of fact in pertinent part:

**GROUND 6**
**(Amended Petition)**
**MENTAL INCOMPETENCE**
**T.C.A. §§ 36-1-113(g)(8)**

22. The Court finds based on the testimony of witnesses, and thorough review of the voluminous records from various mental health providers over the years that [Mother] is incompetent to provide adequately for the further care and supervision of the children because her mental condition is impaired and is so likely to remain impaired to a level that she will probably not be able to resume the care and responsibility for the children in the near future.

23. The testimony of [Mother's] family members was that she first manifested issues with her mental health at the age of six years old and continued throughout her childhood and early adulthood.

24. [Mother's] mental health problems were further exacerbated by her use of illegal drugs, and failure to follow her doctors' orders in the use of her prescription medication.

25. [Mother] had over a dozen hospitalizations with many instances wherein she would appear at an emergency room displaying thoughts and statements that were not based in reality and was subsequently hospitalized.

26. [Grandmother] testified that several hospitalizations were due to the mother not taking her psychotropic medications as prescribed. Further that due to the same issue on one occasion the mother struck [Grandmother] on her arm. On another occasion when the mother requested [Grandmother] [to] take her [to] get cigarettes and when [Grandmother] refused the mother held a knife close to [Grandmother's] face requiring several individuals to restrain her and remove the knife. The mother was subsequently hospitalized after that event.

27. [Mother] has a persistent history of being prescribed medication to address her mental health, not taking it appropriately leading to psychotic episodes and decompensation. This was the driving factor for her mother and sister to eventually gain conservatorship in Tennessee and guardianship in Virginia in order to take control over [Mother's] person to ensure she received proper mental health treatment.

28. The conservatorship and guardianship orders were supported by qualified physicians who evaluated [Mother] and determined that she was not able to manage her own affairs in that her mental condition was severe, persistent, disabling, and most likely permanent.

29. [Mother] was diagnosed with schizoaffective disorder characterized by psychotic features with deterioration from a previous level of functioning. She has experienced delusions or hallucinations[,] grossly disorganized behavior and incoherence, loosening of associations, illogical thinking, and poverty of content of speech with blunt affect. She has depression characterized by anhedonia, sleep disturbance, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, and hallucinations, delusions, and paranoid thinking.

30. [Mother's] psychological evaluation states that her impairments cause marked restriction in activities of daily living, marked difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and episodes of decompensation each of extended duration.

31. [Mother's] medical records indicate a history of severe mental illness going back to childhood to wit:

> a) On May 24th 1994 [Mother] was hospitalized at HCA Dominion Hospital and the treating physician noted the day previous to admission she was planning to kill herself by jumping into the family swimming pool, but stopped at the last minute. [Mother] tried to run away but her parents stopped her. Over the previous week [Mother] was disruptive at school and unable to follow directions.
>
> b) [Mother] was in the fourth grade and had a long history of aggressive behavior and depression. She had outbursts wherein she screamed, bit and scratched herself, banged walls, and threw objects. She also attacked her parents and became increasingly rageful in the past week. Her academic

- 7 -

functioning had declined since February 1994, decreased concentration and hypersexual behavior. She had been in counseling since age five, and been treated with Mellaril, Imipramine, and Zoloft.

c) [Mother] was placed at Springwood inpatient facility in 1990 and 1992 and was diagnosed with major depression and attention deficit hyperactivity disorder and treated with Ritalin, Clonidine, and Prozac and was discharged on June 7th, 1994.

d) From August 2011 to December 2015 [Mother] received treatment from Frontier Mental Health for depression and anxiety. The records indicate she experienced symptoms of hopelessness, helplessness, problems with sleep, and feeling overwhelmed and she was diagnosed with mood disorder, bipolar disorder, depressive disorder, and anxiety disorder and was treated with medication and case management. She completed intensive outpatient program for substance abuse and attended group meetings to assist with recovery.

e) From November 25th, 2013, to February 5th, 2014, [Mother] completed Rainbow Residential treatment program for cocaine addiction.

f) From June 2014 to October 2014 [Mother] received mental health treatment at the Lloyd C. Elam Mental Health Center, whose records show she had a history of bipolar disorder and substance dependence. She reported having depressive symptoms and manic and hypomanic symptoms. The records also state [Mother] had decreased concentration, focus, and hallucinations and she was treated with Topamax, Lithium, Cymbalta, and Neurontin.

g) From September 15th, 2014, to September 18th, 2014, [Mother] was hospitalized at Middle Tennessee Mental Health Institute. The records indicate she reported symptoms of depression, memory loss, auditory and visual hallucinations for the last couple of weeks; feeling electrical shocks all over her body; and having suicidal thoughts. She was diagnosed with bipolar disorder with psychotic features, and was discharged with Venlafaxine, Lithium, Topamax, Gabapentin, Vistaril, Haldol, Cogentin, and Buspar.

h) From December 27th, 2015, to December 29th, 2015, [Mother] was hospitalized at Indian Path Medical Center due to an altered mental status. Their records indicate that she was having confusion and auditory hallucinations. She reported that she had not taken her Lithium in two days and was having severe anxiety. [Mother] was diagnosed with altered mental state, auditory hallucinations, and bipolar disorder and was prescribed Gabapentin, Lithium, Lorazepam, Montelukast, Tamsulosin, Tizanidine, and Topiramate.

i) On January 9th, 2016, [Mother] was seen at Indian Path Medical Center emergency room and the records indicate she exhibited significant confusion, anxiety, rambling, moderate paranoia with disjointed thought processes. The treating physician noted that her sentences would begin only to quickly trail off and virtually all her verbal output ended with little coherent or purposeful conclusions. She was observed to wring her hands and seemed to be at a loss to express herself satisfactorily, and that her frame of mind was frightening to her. She was transferred to Woodridge Hospital for mental health treatment.

j) From January 9th, 2016, to January 15th, 2016, [Mother] was hospitalized at Woodridge Hospital for mental health treatment.

k) On January 19th, 2016, [Mother] was seen at the emergency room whose records indicate she had an altered mental state, confusion, paranoia, manic, rambling, and tangential speech. She was diagnosed with psychosis and transferred to Woodridge Hospital for mental health treatment.

l) On February 24th, 2016, [Mother] was seen at the emergency room, whose records indicate she had severe paranoia, anxiety, agitation and withdrawal. She was noted to have illogical though[t] processes and flight of ideas and was unable to answer questions appropriately and was transferred to Woodridge Hospital for mental health treatment.

m) On March 15th, 2016 [Mother] [was] seen at the emergency room whose records indicate she was displaying anxiety, depression, and hallucinations. The treating physician noted

that she was at the emergency room a few days prior but left prior to treatment. The physician reported [Mother] had difficulty formulating answers, and she appeared scared and anxious, and was scratching her body and scalp. She was diagnosed with psychosis and transferred to Woodridge Hospital for mental health treatment.

n) In August 2016 [Mother] was released from Woodridge Hospital inpatient treatment and returned in December 2016 and remained there. Her discharge plan was to be committed permanently to a mental health facility once placement had been found.

o) Dr. Rajesh Kadam recommended a conservator be appointed for [Mother] because she suffered from a mental condition of such severity that she is unable to make reasonable decisions regarding her medical or her health in general. Dr. Kadam reports that [Mother] is severely chronically mentally ill, and her mental illness was severe in degree and had led to mental impairment. He further reports that she had poor chronic mental condition, social conditions, adaptive behavior, and social skills, and poor physical condition, and had fair, poor, chronic educational condition.

32. [Mother] was declared disabled due to her mental illness by the Social Security Administration effective May 31st, 2013.

33. [Mother] contacted DCS while she was a patient at Woodridge hospital in 2016 and 2017 and made outrageous claims that she was then pregnant with seven children; that Woodridge stole a previous child she was pregnant with; that she has been drugged and physically abused; that she has a myriad of physical ailments including various cancers; that she is the mother of thirty three children and the majority of them were embryos housed by the State and placed in surrogates; that [Father] has all of the children in his custody at this time.

34. Since 2017 [Mother] has been relocated to Virginia and having reviewed the medical and mental health records from her various providers in that state it is noteworthy that some of the medications she was prescribed seem to have exacerbated her symptoms. Some of the complaints she made to medical professionals that were deemed to be illogical may have been actual side effects of the medications.

- 10 -

35. In reviewing Exhibit 13, records from Prince William County dated January 27th, 2022, it details her past medications, treatment, and her plan for her future care with her legal guardians. Since that time the records reflect that [Mother's] condition has stabilized at least to the extent she has not experienced the severe psychosis she suffered in the past.

36. [Mother's] diagnosis reflects, and this Court so finds that her mental impairment is most likely a permanent one. She has demonstrated over the years that she is not capable of maintaining her medication and treatment on her own and has done better recently due to her guardians overseeing her care. This has been for a limited time of approximately two years of a thirty-year mental impairment.

37. [Mother] has been able to obtain employment and assist with caring for other children in the home but is not left alone with them as her guardians or other adults are always present.

38. [Mother] does not have a drivers license, does not have a car, and her income is approximately $540 per month. She relies extensively on her family for support and for her own care.

39. [Mother] testified that if she had custody of the children, she would need the assistance of others to care for them as would any parent. This Court finds that to be true to a certain extent however due to the foregoing [Mother] is not mentally capable of providing care for her children.

40. The Court finds there is little chance that [Mother's] condition can be improved to such an extent that the children can be placed safely with her in the foreseeable future.

The Juvenile Court further found that DCS proved by clear and convincing evidence that termination of Mother's parental rights was in the Children's best interest. Mother timely appealed.

## Discussion

Although not stated exactly as such, Mother raises one issue on appeal: whether the Juvenile Court erred by finding the statutory ground of mental incompetence by clear and convincing evidence. Even though Mother does not raise an issue related to the Juvenile Court's best interest determination, we nevertheless must review this issue as well. *See In re Carrington H.*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[I]n an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as

to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.").

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

- 13 -

court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and

- 14 -

convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). In conjunction with a best interest determination, clear and convincing evidence supporting any single ground will justify a termination order. *E.g.*, *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

The Juvenile Court found that DCS proved by clear and convincing evidence the statutory ground of mental incompetence, pursuant to Tenn. Code Ann. § 36-1-113(g)(8), which provides:

(A) The chancery and circuit courts shall have jurisdiction in an adoption proceeding, and the chancery, circuit, and juvenile courts shall have jurisdiction in a separate, independent proceeding conducted prior to an adoption proceeding to determine if the parent or guardian is mentally incompetent to provide for the further care and supervision of the child, and to terminate that parent's or guardian's rights to the child;

(B) The court may terminate the parental or guardianship rights of that person if it determines on the basis of clear and convincing evidence that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and

(ii) That termination of parental or guardian rights is in the best interest of the child;

(C) In the circumstances described under subdivisions (8)(A) and (B), no willfulness in the failure of the parent or guardian to establish the parent's or guardian's ability to care for the child need be shown to establish that the parental or guardianship rights should be terminated[.]

This Court has previously explained the components of this statutory ground as follows:

> The statute is intended to prevent a child from remaining indefinitely in foster care when the parents will not be able to properly care for the child due to mental illness. *In re Diamond F.*, No. M2020-01637-COA-R3-PT, 2022 WL 905791, at *10 (Tenn. Ct. App. Mar. 29, 2022). The relevant inquiry is whether clear and convincing evidence establishes that "the parent of the child is incompetent to adequately provide care and supervision because the parent's mental condition is so impaired and likely to remain so that it is unlikely that the parent will be able to assume care and responsibility for the child in the future." *In re Jayda J.*, No. M2020-01309-COA-R3-PT, 2021 WL 3076770, at *6 (Tenn. Ct. App. July 21, 2021) (quoting *State Dept. of Children's Services v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430, at *14 (Tenn. Ct. App. May 30, 2002)). A finding of mental incompetence does not require a condition that is untreatable. *In re Josie G.*, [No. E2021-01516-COA-R3-CV,] 2022 WL 4241987, at *10 [(Tenn. Ct. App. Sept. 15, 2022)]. Instead, the statute requires impairment to the extent that the parent cannot adequately provide care and supervision of the child. *Id.* DCS must show (1) that the parent is presently unable to care for the child; and (2) that the parent is unlikely to be able to care for the child in the near future. *In re Joseph D.*, No. M2021-01537-COA-R3-PT, 2022 WL 16848167, at *19 (Tenn. Ct. App. Nov. 10, 2022) (citing *In re David J.B.*, No. M2010-00236-COA-R3-PT, 2010 WL 2889265, at *7 (Tenn. Ct. App. July 23, 2010)).

*In re B.D.M.*, No. E2022-00557-COA-R3-PT, 2023 WL 3019005, at *14 (Tenn. Ct. App. Apr. 20, 2023).

We further note that this statutory ground is not limited to a condition for which "no amount of intervention can assist." *In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *6 (Tenn. Ct. App. Nov. 18, 2008). This Court has previously explained:

> This Court has instead affirmed the termination of parental rights when parents have suffered from unalleviated mental disorders such as bipolar disorder, adjustment disorder with anxiety and depressed mood, dependent personality disorder, and schizophrenic disorder. *See e.g.,* [*State, Dep't of Human Servs. v.*] *Smith*, 785 S.W.2d [336] at 337-39 [(Tenn. 1990)] (affirming the termination of parental rights of a parent diagnosed with schizophrenic disorder on the basis of mental incompetence although the acts of the mentally disabled parent were not willful); *In re S.M.R.*, [No. M2008-01221-COA-R3-PT,] 2008 WL 4949236, at *6 [(Tenn. Ct. App. Nov. 18, 2008)] (affirming termination of parental rights on the statutory ground of

- 16 -

mental incompetence when the parent was diagnosed with bipolar disorder and personality disorder, not otherwise specified); *Dep't of Children's Servs. v. M.R.N.*, No. M2006-01705-COA-R3-PT, 2007 WL 120038, at \*10 (Tenn. Ct. App. Jan. 17, 2007) (affirming termination of parental rights on the statutory ground of mental incompetence based on a diagnosis of adjustment disorder with anxiety and depressed mood as well as dependent personality disorder). The parent's mental condition, however, must impair the parent to an extent that he or she cannot adequately provide for the care and supervision of the child. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i).

*In re Kenneth D.*, No. M2022-01466-COA-R3-PT, 2023 WL 4249519, at \*8 (Tenn. Ct. App. June 29, 2023).

In summarizing the Juvenile Court's findings of fact, we note that the Juvenile Court found that DCS had proven this statutory ground for termination based upon Mother's long and persistent history of severe mental illnesses, numerous hospitalizations, her history of not taking prescription medication as directed, the likely permanence of her mental illnesses, Grandmother's and Aunt's guardianship of her, and the significant facts that Grandmother does not permit her to be alone with children in the household and Grandmother's and Aunt's continued administration of her prescription medication. The evidence does not preponderate against these findings.

In the decade preceding trial, Mother had been in and out of numerous inpatient and outpatient programs and mental health facilities and hospitals, her most recent hospitalization occurring in October 2019 after she threatened Grandmother with a knife. Mother has consistently been diagnosed with various mental illnesses such as schizoaffective disorder, bipolar disorder, delusional disorder, depression, and anxiety. She also experienced periods of delusions and hallucinations in the past. Her most recent medical records reflect a diagnosis of "Bipolar Disorder, Severe, with Psychotic Features." Mother testified that she has been diagnosed with anxiety, post-traumatic stress disorder, attention deficit hyperactivity disorder, schizoaffective disorder, and bipolar II disorder.

On appeal, Mother primarily argues that her mental condition has stabilized since her last hospitalization and that she is not presently so impaired that she cannot assume care and custody of the Children. Mother points to the fact that she is not currently hospitalized, that she lives with and has the support and assistance of Grandmother and Aunt, that she lives with and helps care for Makinlyn, and that she has been compliant with her treatment plan. We agree, as did the Juvenile Court, that Mother's condition improved once Grandmother and Aunt were appointed guardians for her. However, we ultimately agree with the Juvenile Court's finding of this statutory ground, emphasizing that Mother's mental stability is a relatively new development and that she relies heavily on Grandmother and Aunt to maintain that stability.

Mother's last hospitalizations were in May and October of 2019. Mother was hospitalized in May 2019 after she attempted to withdraw money from a non-existent bank account, believed she was married to and had children with country music artist Luke Bryan, and believed that Grandmother was holding her hostage. In September 2019, the Virginia Court appointed Grandmother and Aunt as Mother's guardians upon finding that she was unable to make medical decisions and that her disability likely was permanent. Shortly thereafter, in October 2019, Mother was hospitalized after assaulting her brother's girlfriend and threatening Grandmother with a knife. Her most recent medical records reflect that her hospitalization was the result of "bizarre and reckless behavior such as spending nights on the front porch and refusing to come inside, walking from Novant Hospital to I-66 and catching a ride from a stranger to her sister's house [ ], and delusional beliefs such as working for the FBI and President Trump 'helping secure the borders.'"

Mother was discharged from an inpatient mental health facility in January 2020. The record reveals no other psychotic or violent episodes since then. Mother's last hospitalization and inpatient treatment was approximately two and half years prior to the conclusion of trial. Nevertheless, given Mother's long and persistent history of psychotic episodes, delusions, and recurring hospitalizations, we conclude that the Juvenile Court reasonably treated Mother's new-found stability cautiously and did not afford it great weight in the face of decades of untreated or mistreated mental illnesses and the Virginia Court's finding that her mental condition likely was permanent.

Even more concerning are the facts that Grandmother and Aunt continue to administer Mother's medication, keep her medication in a lock box, and do not leave Mother alone with Makinlyn or any other children in the household. During her testimony, Grandmother affirmed that she and Aunt petitioned for a guardianship of Mother because she had been diagnosed with "persistent delusional disorder, schizophrenia, and seizure disorder." Grandmother testified that Mother continues to split time living between Grandmother's home and Aunt's home. She explained that, as her guardians, Aunt and she ensure that Mother "takes proper medical care, she shows up for appointments, she has her medications correctly, housing, and just looking after her general well-being."

Although Grandmother testified that Mother is much better since her last hospitalization in 2019, she was not confident that Mother could assume care and custody of the Children and maintain their care and custody without assistance, as shown by this interaction between DCS's attorney and Grandmother:

Q. Is she in the position to take custody of her children at this point? Do you think that Kamdyn and Bentyn should be placed in her custody and care?

A. With help she can do it.

Q. No, do you think, based on your knowledge of her as her mother, as her conservator and as her guardian, do you think that she is currently, and knowing her as well as you do, living under the same roof for however many years and now living with your other daughter and having daily contact as you previously testified to, is she today in a position to take care and custody of Kamdyn and Bentyn?

A. Yes.

Q. Yes?

A. Yes.

* * *

Q. Okay, fine. Is she able to take care of [Makinlyn] on her own without assistance?

A. Is she able to take care of . . .

Q. Any child.

A. Any child?

Q. Any child, on her own, with no assistance from any adult?

A. On a normal day, yeah.

Q. Why haven't you transferred custody of [Makinlyn] back to her then?

A. Because I have a guardianship of [Mother].

* * *

Q. How does that answer the question? Is it because you have a guardianship of [Mother] and she can't have custody of [Makinlyn]?

A. We just haven't done that.

* * *

Q. Yes, Tennessee will come to Virginia and take [Makinlyn] away from [Mother]. That is why you have not transferred legal custody back to [Mother]? It's not because [Mother] can't do it, right?

A. [Mother] is still getting better. She is getting better everyday.

* * *

Q. Yes, living independently on her own, caring for children, twenty-four hours a day, on her own without the assistance of another adult living with her. Can she do that?

A. If she had to, yes, I think she could. Would it be extremely difficult? It is extremely difficult on any parent.

* * *

Q. So you do trust [Mother] with children?

A. Am I somewhere in the house or close by?

Q. I don't know.

A. I am.

Q. You would trust her with children as long as you were around?

A. Someone was around.

Q. <u>As long as someone was around, another adult, right?</u>

A. <u>Yeah.</u>

(Emphasis added.) With respect to Mother's medication, Grandmother explained that she keeps Mother's prescription medication in a "locked box" and that Aunt or she gives the medication to her at "8:00 in the morning and 8:00 at night and they are handed to her." Mother's most recent medical assessment reflects that the stabilization of her symptoms is due to medication management.

In sum, Grandmother's testimony demonstrated that although Mother's mental stability had improved, her treatment and improvement were still ongoing but not yet fully realized. Grandmother further testified that Mother could care for a child without assistance on a "normal day." Nevertheless, a parent must be able to care for his or her

- 20 -

child every day. Moreover, it is troubling that Grandmother affirmed that she would not leave Mother alone with a child without another adult's supervision.

Mother candidly testified how she feels about the guardianship over her:

Q. You are aware that your mom and your sister have legal guardianship over you at this point, right?

A. Yes.

Q. What does that mean to you?

A. I don't really like it. I am almost forty years old and I think I can take care of myself. I don't think I need that. I think at one point I did but I don't think I need it now.

Q. What is different? Well, let's back up, [Mother], why would you say at one point you did need it?

A. Because I wasn't stable and I wasn't able to take care of myself let alone anyone else. I think I am doing really well now and I am able to take care of myself and can take care of other people. I don't see that it is necessary anymore.

Q. Have you talked to them about getting rid of it?

A. They know that.

Q. They know what?

A. They know I don't like the idea of the guardianship.

Q. I guess my question and I know it is broad when I said what does it mean to you. I guess I should ask more specifically how does your mom and sister use the guardianship? How does that come into play in your daily life? How does that work with your interactions with them and with other people and other institutions, I guess?

A. I was used to keeping my medicines or other certain things put where I wanted to put them and take them when I wanted to take them like at 6:00 in the morning and at 6:00 at night or you know stuff like that. I had my own little routine down. That got messed up when they took over doing that stuff.

They started a whole new routine for me then. That messed me up and bothered me. It is just little stuff like that.

Q. Is there other stuff that bothers you about the guardianship? Is there other things they have changed that you disagree with?

A. I just feel restricted.

Q. Are you not allowed to go places if you want to go somewhere? Do they not let you if you ask to go somewhere?

A. Yeah.

* * *

Q. Is the conservatorship an issue for you? Does your mother and your sister say that you can't be alone with those other kids?

A. No, they don't say I can't be alone with them or anything but . . . well, like yesterday she said didn't want me going without my brother's girlfriend to take [Makinlyn] to Pal's. That bothered me.

* * *

A. One minute she is okay with me doing something and the next minute she is not and it confuses me. I don't know why. I don't know.

Mother's testimony reflects several important facts. First, it is significant that she does not think she needs a guardianship, revealing that she does not fully grasp the gravity of her mental illnesses or her dependency on Grandmother and Aunt. Mother later testified that she believed the Children should have never been removed from her custody. Additionally, it is significant that Grandmother did not let Mother accompany Makinlyn alone to a restaurant as recent as the day before Mother's testimony, which clearly demonstrates that Grandmother, who lives with and sees Mother every day, is not ready to leave a child alone with Mother. We therefore conclude that DCS provided clear and convincing evidence that Mother would be unable to supervise and care for the Children due to her mental illnesses. *See* Tenn. Code Ann. § 36-1-113(g)(8)(B)(i) ("The parent or guardian of the child is incompetent to adequately provide for the further care and <u>supervision</u> of the child because the parent's or guardian's mental condition is presently so impaired . . . .") (emphasis added).

The evidence also supports the Juvenile Court's finding that Mother's mental condition likely is permanent and that Mother is unlikely to be able to provide care for the

Children in the near future. In 2016, the Chancery Court appointed Grandmother Mother's conservator in part based upon the affidavit of a physician who examined Mother. In the affidavit, the physician stated that Mother was "severely chronically mentally ill." In appointing Grandmother and Aunt guardians of Mother, the Virginia Court found that Mother was "unable to make medical decisions", "improvement would not be expected", and that the "probable duration of her disability is permanent in nature." Mother's long history of mental illness, hospitalizations, and psychotic episodes, dating back to her childhood, also supports the Juvenile Court's determination that Mother's mental incompetence likely is permanent.

The Juvenile Court's determination is further supported by Grandmother's and Mother's testimony that at the time of trial, Grandmother and Aunt were in full control of Mother's medication, kept it locked away, and administered it to Mother. Mother cannot be expected to adequately care for the Children when she cannot be trusted to adequately care for herself. This is compounded by the fact that Mother no longer desires to be under their guardianship and would like to administer her prescription medication herself. Mother does not wish this arrangement to continue, despite the fact that the guardianship appears to be the reason why her symptoms have stabilized in the last two years.

Furthermore, there was no indication that Grandmother and Aunt were ready to dismiss the guardianship or return custody of Makinlyn to Mother at the time of trial. As already noted, Grandmother would not let Mother accompany Makinlyn alone to a restaurant the day before the final day of trial. Mother's mental stability has improved, but Mother's own advocates are unwilling to trust Mother on her own at the time of trial. Grandmother insisted that Mother was getting better every day, implying that her progress is ongoing. There is simply no evidence in the record to indicate that the guardianship will end any time soon or, more importantly, that it should end any time soon. We acknowledge Mother's recent improvement, but in light of her long history of mental illnesses and recurring psychotic episodes, we conclude that her recent improvement is tenuous and fragile. Accordingly, we conclude, as did the Juvenile Court, that DCS proved by clear and convincing evidence that Mother's mental illnesses likely were permanent and that it is unlikely that Mother would be able to assume the care of and responsibility for the Children in the near future.

On appeal, Mother argues that she should be able to parent the Children with the assistance of Grandmother and Aunt. Mother references the Americans with Disabilities Act ("the ADA"), arguing that "mentally disabled parents are entitled to accommodations to help them with parenting." Neither party cites a Tennessee law or court decision addressing this issue, nor have we found one. We accordingly look to other jurisdictions for guidance. *Summers Hardware & Supply Co., Inc. v. Steele*, 794 S.W.2d 358, 362 (Tenn. Ct. App. 1990) ("Cases from other jurisdictions, including federal cases, are always instructive, sometimes persuasive, but never controlling in our decisions.").

- 23 -

We find the Alabama Court of Civil Appeal's analysis of this issue to be instructive:

"The ADA, specifically 42 U.S.C. § 12132, provides:

"'Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'

"The [parent] contends that DHR [Department of Human Resources] is a public entity that discriminated against her by terminating her parental rights on the basis of her mental deficiency. Pursuant to the ADA, a 'mental impairment that substantially limits one or more of the major life activities of [an] individual' is a disability. 42 U.S.C. § 12102(2). The ADA requires a public entity to make 'reasonable accommodation' to allow the disabled person to receive the services or to participate in the programs provided by the public entity. 28 C.F.R. § 35.130(b)(7)(1994).

"Most of the ADA challenges to parental-rights-termination proceedings have been based on the premises either (1) that the ADA preempts a state's termination-of-parental-rights statutes by virtue of the Supremacy Clause of Art. VI of the United States Constitution and, accordingly, that the party seeking termination must show that the requirements of the ADA have been met or (2) that the ADA constitutes a defense to a parental-rights-termination proceeding. Both types of challenges have been rejected by the vast majority of the courts that have considered them. *See generally* Sherry S. Zimmerman, Annot., *Parents' Mental Illness or Mental Deficiency as Ground for Termination of Parental Rights—Applicability of Americans with Disabilities Act*, 119 A.L.R.5th 351 (2004). The Hawaii Supreme Court presented an accurate summary of the law with respect to this issue in *In re Doe*, 100 Haw. 335, 60 P.3d 285 (2002):

"'Many of the cases examining the issue of parental rights and the ADA hold that a termination proceeding is not a "service, program, or activity" within the definition of the ADA and, consequently, the ADA does not apply to such proceedings. *See In re Anthony P.*, 84 Cal. App. 4th 1112, 101 Cal.Rptr.2d 423, 425 (2000) ("a proceeding to terminate parental rights is not a governmental service, program, or activity"); *In re Antony B.*, 54 Conn. App. 463, 735 A.2d 893, 899 (1999) (the ADA "neither provides a defense to nor creates special obligations in a parental rights termination

- 24 -

proceeding"); *M.C. v. Dept. of Children and Families*, 750 So.2d 705, 706 (Fla. Dist. Ct. App. 2000) ("[D]ependency proceedings are held for the benefit of the child, not the parent."); *In re Terry*, 240 Mich. App. 14, 610 N.W.2d 563, 569 (2000) ("<u>Termination of parental rights proceedings are not 'services, programs or activities' . . . [and] therefore a parent may not raise violations of the ADA as a defense to termination of parental rights proceedings.</u>"); *In re Adoption of Gregory*, 434 Mass. 117, 747 N.E.2d 120, 125 (2001) ("Proceedings to terminate parental rights are not 'services, programs, or activities,' under provision of [the ADA] . . . and therefore, the ADA is not a defense to such proceedings.").

* * *

"100 Haw. at 340-41, 60 P.3d at 290-91."

13 So.3d at 975-76.

*S.G. v. Barbour Cnty. Dep't of Human Res.*, 148 So.3d 439, 446-47 (Ala. Civ. App. 2013) (quoting *K.J. v. Tuscaloosa Cnty. Dep't of Human Res.*, 13 So.3d 971, 975-76 (Ala. Civ. App. 2008)) (emphasis added). The Alabama Court of Civil Appeals in *S.G. v. Barbour Cnty. Dep't of Human Res.* concluded: "Consistent with the majority of courts that have considered ADA challenges to termination-of-parental-rights proceedings, we hold that a termination-of-parental-rights proceeding is not a service, program, or activity within the meaning of the ADA and that, therefore, the ADA does not apply to such a proceeding." *Id.* at 447.

We first note that, in making its best interest determination, the Juvenile Court found that DCS made reasonable efforts to assist Mother, and that Mother does not contest this finding. Moreover, the evidence does not preponderate against this finding. However, Mother instead argues that she is entitled to retain her parental rights to the Children because she has the assistance of Grandmother and Aunt. She does not argue that a state agency or the Juvenile Court discriminated against her based upon her disability. We fail to discern how the ADA protects her parental rights just because she currently has the assistance of relatives, particularly when there is no guarantee such assistance will continue given Mother's desire to shed her guardianship. Furthermore, as demonstrated by *S.G. v. Barbour Cnty. Dep't of Human Res.*, numerous state courts have rejected the proposition that the ADA is a defense to a termination of parental rights proceeding.

Mother also points to this Court's opinion, *State Dep't of Children's Servs. v. Whaley*, No. E2001-00765-COA-R3-CV, 2002 WL 1116430 (Tenn. Ct. App. May 30, 2002), in arguing that the Juvenile Court should have accounted for the assistance she

receives from Grandmother and Aunt. With assistance, Mother argues that she can care for and maintain responsibility for the Children. In *Whaley*, this Court reversed the juvenile court's termination of a blind and mentally impaired mother's parental rights, finding the following:

> Ms. Whaley has managed to live alone and take care of herself for several years. She has attended almost every scheduled visitation with her son. When Ms. Whaley lived in Smyrna and was in vocational training she rode a Greyhound bus back to Cleveland every other weekend to visit with her son. She has been able to regulate and properly administer her own prescription medications. She has completed vocational training and has obtained a job. She is able to move about the community using public transportation. Ms. Whaley manages to get herself to work on the correct days and at the correct time as well as attending church every Sunday. Most importantly, Ms. Whaley has a friend who is a retired educator and foster parent willing to assist her in the parenting of her child. These factors negate the argument that Ms. Whaley is incompetent to provide care and supervision to a child.

*Id.* at *14.

However, the mother's assistance by her friend in *Whaley* was just one of many factors that weighed against a finding of this statutory ground. Unlike the mother in *Whaley*, Mother does not regulate and administer her own prescription medications, a significant fact in this case given Mother's history of not taking medication as prescribed. When Mother did live alone, her mental illnesses were not managed or were managed poorly. Mother is entirely reliant on the stable environment Grandmother and Aunt have fostered. They do not provide merely supplemental assistance to Mother but rather the entire framework and environment in which Mother's mental health remains stable. We accordingly find *Whaley* distinguishable from the facts in this case and conclude that there was clear and convincing evidence to support this statutory ground for termination.

Having concluded that DCS established at least one statutory ground for termination of Mother's parental rights, we now consider the Juvenile Court's determination that termination of her parental rights is in the Children's best interest. On October 12, 2021, when DCS filed its second amendment to its termination petition, the statutory best interest factors read as follows:

> (i)(1) In determining whether termination of parental or guardianship rights is in the best interest of the child, the court shall consider all relevant and child-centered factors applicable to the particular case before the court. Those factors may include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

(2) When considering the factors set forth in subdivision (i)(1), the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(3) All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order.

(4) Expert testimony is not required to prove or disprove any factor by any party.

(5) As used in this subsection (i), "parent" includes guardian.

Tenn. Code Ann. § 36-1-113(i) (West July 1, 2021 to June 30, 2022).

With regard to making a best interest determination, the Tennessee Supreme Court has instructed:

> These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H.*, 483 S.W.3d at 523 (citing *In re Audrey S.*, 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of

the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).[5]

In its best interest analysis, the Juvenile Court considered each of the relevant factors enumerated in Tenn. Code Ann. § 36-1-113(i). The Juvenile Court made findings of fact for each factor, and the evidence does not preponderate against those findings. The Juvenile Court reasoned that the Children had spent most of their lives in Foster Parents' home and noted that Kamdyn testified that he desired to stay with Foster Parents and that he viewed them as his parents. The Juvenile Court found that to remove the Children from their current home would be devastating to them. In contrast, Mother only recently had developed a semblance of mental stability and, as the Juvenile Court found, her commitment to maintaining consistent mental health is uncertain. Given her long history

---

[5] In *In re Gabriella D.*, a prior version of the best interest factors was in effect. However, we believe the Tennessee Supreme Court's analysis applies to the amended version of Tenn. Code Ann. § 36-1-113(i), as well.

of hospitalizations, desire to have control over her medication, and frustration with the guardianship, the evidence certainly supports this finding.

In contrast to their parental attachment with Foster Parents, the Juvenile Court found that there was no secure and healthy parental attachment between Mother and the Children. There is no meaningful relationship between the Children and Mother given that Mother had not seen the Children since 2016. Kamdyn testified that he wanted to stay with Foster Parents because he had lived with them his whole life, and he described Mother's and Grandmother's home as "chaotic." The Juvenile Court further found that Mother had not provided safe and stable care for the Children and would not be able to "one on one." Mother's and Grandmother's testimony supported this finding. Mother is not left alone with children.

Much depends on Mother's continued medication management and supervision. As the Juvenile Court noted with respect to factor (P), whether Mother understands the Children's needs depends on whether Mother is taking her medication as prescribed. With respect to factors (Q) and (R), the Juvenile Court found that she is not yet able to provide the Children with consistent and proper care, and that her ability to provide the Children with a safe and healthy environment depends on the supervision of another adult. Although the Juvenile Court found that these factors did not weigh in favor of or against termination, the Juvenile Court's findings related to these factors reflect the fragility of Mother's mental status and that she cannot parent alone. The Juvenile Court further found that Mother's mental unfitness would be detrimental to the Children and prevent her from consistently and effectively providing safe and stable care and supervision for the Children. The evidence does not preponderate against the Juvenile Court's findings and clear and convincing evidence supports its determination that termination of Mother's parental rights was in the Children's best interest. We accordingly affirm the Juvenile Court's judgment.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of costs below. The costs on appeal are assessed against the appellant, Tara C., and her surety if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE

- 30 -